## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EMPAGIO ACQUISITION LLC and ) 
SMB CAPITAL CORPORATION, )

      Plaintiffs, )    C.A. No.:_____

vs. )

WORKSTREAM INC., )

      Defendant. )

### COMPLAINT

Plaintiffs, EMPAGIO ACQUISITION LLC ("Empagio") and SMB CAPITAL CORPORATION ("SMB"), through their undersigned attorneys, for their complaint and claims for relief against WORKSTREAM INC. ("Workstream"), allege as follows, upon knowledge as to themselves and upon information and belief as to all other matters:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Empagio is a Delaware limited liability company with its principal place of business in Orlando, Florida.

2.    Plaintiff SMB is a Delaware corporation and wholly-owned subsidiary of Empagio.

3.    Defendant Workstream, is a Canadian corporation, with its principal place of business in Ottawa, Ontario, Canada. Workstream also is a company publicly registered with the Securities and Exchange Commission (the "SEC") and its shares of stock are publicly traded.

4.    Jurisdiction and venue are proper in this Court under the terms of the parties' Agreement and Plan of Merger dated February 12, 2008 (hereinafter, the "Merger Agreement").

A true and correct copy of the Merger Agreement, without attachments, is attached hereto as

**Exhibit "A,"** which provides in pertinent part:

> **SECTION 9.09.** <u>Consent to Jurisdiction</u>. Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of Delaware or of any state court located in the State of Delaware in the event any dispute arises our of this Agreement or the transactions contemplated by this Agreement, [and] (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.

5.    The Court has diversity jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of Delaware and a citizen of Canada.

## THE PARTIES' MERGER AGREEMENT AND TERMINATION

6.    On February 12, 2008, the parties entered into the Merger Agreement for the ultimate purpose of merging Empagio and Workstream, through their wholly-owned subsidiaries, in a transaction by which, *inter alia*, Empagio would be liquidated and its shares in SMB would be distributed to its members and then exchanged for common shares in Workstream.

7.    The Merger Agreement remained in effect until June 13, 2008, when Empagio and SMB terminated the Merger Agreement based upon various material breaches (more particularly described below) of the Merger Agreement by Workstream and a number of materially adverse developments (more particularly described below) in the business of Workstream. A true and correct copy of notice of termination is attached hereto as **Exhibit "B."**

## WORKSTREAM'S MATERIAL BREACHES OF THE MERGER AGREEMENT

8.    While conducting due diligence of Workstream, Empagio discovered that Workstream materially breached the Merger Agreement and developed material adverse changes since the execution of the Merger Agreement in several respects, including, without limitation:

a.    **Workstream failed to carry on its business in the ordinary course**. Section 4.01 of the Agreement requires Workstream to *"...carry on its business in the ordinary course, consistent with past practice and... use commercially reasonable efforts to preserve substantially its relationships with customers, vendors and others having material business dealings with it."* Workstream failed to carry on its business in the "ordinary course" in that it experienced severe turmoil within its executive team, has depleted its management, and substantially reduced its sales team. In fact, Workstream has reduced its sales staff to three people, which is far below the staffing reflected in the pro formas provided to induce Empagio to enter into the Merger Agreement.    Moreover, a number of key employees have been terminated.    In short, Workstream's entire management and sales team has been depleted causing Workstream to lose goodwill and become practically invisible in the market.    Based on these developments, Workstream has breached Section 4.01 of the Merger Agreement.

b.    **Workstream disposed of material assets in violation of the terms of the Merger Agreement**.    Although Sections 4.01(a)(v) and (viii) of the Merger Agreement prohibit the disposition of any material properties or assets of Workstream and the modification or amendment of any "Parent Material Contract," Workstream entered into a number of amendments to existing client contracts, which include the sale of substantial assets, that are detrimental to Workstream. For example, on April 17, 2008, Workstream amended an existing Software Source Code Purchase and Sale Agreement dated May 31, 2007, with

- 3 -

Benefitfocus.com, Inc. to, among other things, sell certain additional material assets of Workstream to Benefitfocus.com, Inc. This amendment resulted in Workstream receiving an additional cash payment of $625,000.00 to get a one-time boost to its EBITDA, but this amendment also materially breached the Merger Agreement because, by entering into the amendment, Workstream sold a significant asset, which resulted in no recurrent revenue to Workstream and which may have even established a potential competitor, in violation of the Merger Agreement.

     c. **Workstream's declining cash flow, deteriorating financial condition, and loss of market position, constitute Parent Material Adverse Effects**. Through Section 6.02(b) of the Merger Agreement, Workstream covenanted that no *"Parent Material Adverse Effect"* would occur from the date of the signing of the Merger Agreement until the Closing Date (as defined in the Merger Agreement). Despite this covenant, Workstream has taken actions that reduced its sales revenues, lowered EBITDA, and diminished cash flow significantly as projected by Workstream in its pro formas, in which Empagio relied in determining the value of the business and the fairness of the transaction. In those pro formas, Workstream represented that it would be cash flow positive by the fourth quarter of fiscal 2008 (approximately $500,000 a month). Workstream's financial condition, however, actually deteriorated and Workstream has lost market position, all of which constitute Parent Material Adverse Effects and violate Section 6.02(b) of the Merger Agreement.

     d. **Workstream cannot achieve the positive working capital required under the Merger Agreement by the closing date**. Workstream cannot maintain positive "net working capital" (*i.e.*, assets exceed liabilities) by the Closing Date of the merger as required under Section 6.02(j) of the Merger Agreement, while operating in the ordinary course. Workstream

attempted in vain to *artificially* maintain a positive working capital number by engaging in practices that are not in the ordinary course of Workstream's business, such as laying off sales, administrative and marketing staffs.    This practice had the deleterious effect of sacrificing productive personnel in business for the sake of trying to generate short-term positive working capital.    The material adverse effects of this practice cannot be cured in the next few months, and, thus, this practice not only is in violation of Section 6.02(j) of the Merger Agreement, this practice also constitutes "Parent Material Adverse Effects" in violation of Section 6.02(b) of the Merger Agreement.

      e.    **Workstream is pursuing transactions that are not in accordance with the Merger Agreement**.    Empagio learned through a 13D public filing with the SEC that Workstream is pursuing a potential transaction to convert its Special Warrants into debt in violation of Section 6.02(i) of the Merger Agreement.    Despite being advised by Empagio, through correspondence and during a meeting on June 2, 2008, that any special arrangements related to these Special Warrants must be in accordance with the terms of the Merger Agreement, in particular Section 6.02(i) thereof, Workstream refused to disclose the details of this proposed transaction and has given Empagio no assurances that the Special Warrants will be disposed of in accordance with the terms of the Merger Agreement.

## WORKSTREAM'S PURPORTED NOTICE OF TERMINATION IS ITSELF A MATERIAL BREACH OF THE MERGER AGREEMENT

      9.    Knowing that Empagio and SMB were about to declare Workstream in default of the Merger Agreement for multiple breaches and for material adverse changes in Workstream, Workstream attempted to create a pretext for claiming that Empagio and SMB breached the Merger Agreement.    Workstream even sent its own notice of termination on June 13, 2008 (just barely beating Empagio's impending notice sent that same day).    In purporting to declare a

default, Workstream wrote a single paragraph "Notice of Termination" purporting to invoke Sections 7.01(d) and (f) of the Merger Agreement. A true and correct copy of Workstream's Notice of Termination is attached hereto as **Exhibit "C."**

      10.    Sections 7.01(d) and (f) of the Merger Agreement provide, respectively:

> SECTION 7.01. <u>Termination</u>. This Agreement may be terminated at any time prior to the Effective Time, whether before or after receipt of the Stockholder Approval:
>
> (d)    by Parent if any of the conditions set forth in Section 6.03 shall become incapable of being satisfied with commercially reasonable efforts and shall not have been waived by September 30, 2008;[1]
>
> (f)    by Parent if the Financials Audit has not been completed and delivered to Parent on or prior to May 30, 2008.

      11.    Without reasonable justification, Workstream suggests that Empagio failed to timely provide "Financials Audit"[2] so Workstream could prepare and file the proxy statement for merger approval. This assertion is false, as Workstream knows. Under Section 5.09, Empagio was required to "*use commercially reasonable efforts* to deliver" the Financials Audit to Workstream by May 30, 2008. In fact, Empagio provided the 2007 year-end Financial Audit (the "2007 Audit") by May 30, 2008, after expending great effort over many months and at great expense ($600,000) to complete the 2007 Audit. Empagio also was within days of having

---

[1] The provisions of Section 6.03 require, among other things, that Empagio's and SMB's representations and warranties be true and correct as of the date of the Merger Agreement, that no SMB Material Adverse Effect have occurred since the date of the Merger Agreement, and that Empagio and SMB shall have performed all obligations required to be performed under the Merger Agreement.

[2] As per the Merger Agreement, the "Financials Audit" refer to the audited financial statements discussed in Section 5.09, <u>Audited Financial Statements</u>, that provides:

> SMB shall use its commercially reasonable efforts to deliver to Parent on or prior May 30, 2008 SMB's consolidated and consolidating financial statement and the financial statements for all predecessor entities for the periods required by the Exchange Act and prepared in accordance with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, in a form and of substance reasonably acceptable to Parent, audited by McGladrey & Pullen, LLP (the "*Financials Audit*").

completed the first quarter 2008 Financial Audit (the "Q1 2008 Audit"), having incurred great cost and expense to complete the quarterly audit. Workstream has at all times been aware that, given the complexity of Plaintiffs' consolidated statements (because of the many acquisitions that make up Empagio), the Financials Audit would take longer and cost dramatically more than normal. Workstream was also aware that because the 2007 Audit was not being finalized until May 30, 2008, the Financials Audit would have to be further updated to reflect Q1 2008 Audit which could not even be commenced in a commercially reasonable manner until after the 2007 Audit had been completed. Despite being completely aware of the commercially reasonable manner in which Empagio was proceeding, Workstream falsely accused Empagio of failing to timely provide the Financials Audit.

12.    Workstream's claim completely lacks *bona fides* because Workstream was not prepared to file its proxy statement on or about May 30, 2008, and, thus, Workstream was not prejudiced by any delay in delivery of the Q1 2008 Audit or of the Financials Audit.

13.    In sum, Workstream's Notice of Termination was issued in bad faith and without justification. The Notice of Termination merely was a pretext for attempting to terminate the Merger Agreement and to preempt Plaintiffs from first terminating the Merger Agreement on account of Workstream's many material breaches and material adverse changes described above.

14.    Workstream's Notice of Termination also constitutes grounds for an anticipatory breach because the Notice of Termination reflects Workstream's declaration of intent not to perform its obligations under the Merger Agreement.

## COUNT I
## BREACH OF THE MERGER AGREEMENT

15.    Plaintiff SMB realleges and incorporates herein by reference the allegations set forth in Paragraphs 1 through 14 above as if fully set forth herein.

- 7 -

16.    This is an action by SMB against Workstream for breach of the parties' Merger Agreement for damages in excess of the sum of $75,000.00.

17.    Workstream entered into the Merger Agreement with Plaintiffs.

18.    Workstream breached the Merger Agreement by the acts described above.

19.    As a direct and proximate result of Workstream's actions, Plaintiff SMB has been damaged and has retained the law firm of Greenberg Traurig, agreeing to pay reasonable attorney's fees and costs for its services.

20.    Under the terms of the Merger Agreement, Plaintiff SMB is entitled to a termination fee of $3,000,000.00, as well as costs and expenses, including reasonable legal fees and costs.

21.    Based upon Workstream's wrongful conduct and the express terms of the Merger Agreement, SMB respectfully requests that this Court enter a judgment in favor of SMB and against Workstream that awards SMB the termination fee of $3,000,000.00, as well as costs and expenses, including reasonable legal fees and costs.

## COUNT II
## ACTION FOR DECLARATORY JUDGMENT

22.    Plaintiffs Empagio and SMB reallege and incorporate herein by reference the allegations set forth in Paragraphs 1 through 14 above as if fully set forth herein.

23.    This is an action by Plaintiffs Empagio and SMB against Workstream for a declaratory judgment under 28 U.S.C. § 2201.

24.    Plaintiffs assert that Workstream breached the Merger Agreement and assert that Workstream's Notice of Termination is without effect. In contrast, Workstream purports to assert that Plaintiffs are in breach of the Merger Agreement.

- 8 -

25.    The above circumstances created an actual and present controversy that requires judicial resolution.

26.    Based upon this actual and present controversy, Empagio and SMB respectfully request that this Court declare that they are absolved and released from any liability under the Merger Agreement as a result of Workstream's material breaches and material adverse changes.

WHEREFORE, Plaintiffs demand relief and judgment against Workstream as follows:

a)    Awarding SMB the amount of at least $3,000,000.00, plus prejudgment interest, costs and expenses, and reasonable legal fees and costs, under the terms of the Merger Agreement;

b)    Declaring that Workstream breached the Merger Agreement;

c)    Declaring that Workstream's Notice of Termination was issued without justification and is without effect;

d)    Adjudicating any and all other rights and obligations with respect to the parties under the Merger Agreement;

e)    Awarding Plaintiffs their costs and expenses, including attorneys' fees and expert fees, incurred in this action to the extent not awarded under the terms of the Merger Agreement; and

DEL 86,222,809v2 999918.000020 6-25-08

    f)     Granting such other and further relief as this Court deems just, proper and equitable.

GREENBERG TRAURIG, LLP

Michael J. Maimone (Del. No. 3592)
*maimonem@gtlaw.com*
Titania Mack Parker (Del. No. 4120)
*parkertm@gtlaw.com*
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:    (302) 661-7000
Facsimile:    (302) 661-7360

OF COUNSEL:

Tucker H. Byrd
GREENBERG TRAURIG, P.A.
450 South Orange Avenue, Suite 650
Orlando, Florida 32801
Telephone:  (407) 420-1000
Facsimile:  (407) 841-1295

Dated: June 25, 2008

- 10 -

# EXHIBIT A

AGREEMENT AND PLAN OF MERGER

Dated as of February 12, 2008

Among

WORKSTREAM INC.,

WORKSTREAM MERGER SUB INC.,

EMPAGIO ACQUISITION LLC,

And

SMB CAPITAL CORPORATION

## TABLE OF CONTENTS

Page

ARTICLE I. THE MERGER ....................................................................................... 1
  SECTION 1.01   The Merger .................................................................................. 1
  SECTION 1.02   Closing ......................................................................................... 1
  SECTION 1.03   Effective Time ............................................................................ 2
  SECTION 1.04   Effects of the Merger ................................................................. 2
  SECTION 1.05   Certificate of Incorporation and By-laws ............................... 2
  SECTION 1.06   Directors and Officers ............................................................... 2
ARTICLE II. EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE
CONSTITUENT CORPORATIONS; EXCHANGE OF CERTIFICATES ............... 2
  SECTION 2.01   Effect on Capital Stock ............................................................. 2
  SECTION 2.02   Exchange of Certificates ........................................................... 4
  SECTION 2.03   Reduction of Merger Consideration ........................................ 4
ARTICLE III. REPRESENTATIONS AND WARRANTIES .................................. 7
  SECTION 3.01   Representations and Warranties of Parent and Merger Sub ........ 7
  SECTION 3.02   Representations and Warranties of Empagio and SMB .............. 25
ARTICLE IV. COVENANTS RELATING TO CONDUCT OF BUSINESS ............ 43
  SECTION 4.01   Conduct of Business .................................................................. 43
  SECTION 4.02   No Solicitation ............................................................................ 48
ARTICLE V. ADDITIONAL AGREEMENTS ........................................................ 49
  SECTION 5.01   Preparation of the Proxy Statement ........................................ 49
  SECTION 5.02   Access to Information; Confidentiality .................................... 50
  SECTION 5.03   Commercially Reasonable Efforts ............................................ 50
  SECTION 5.04   Governmental Approvals .......................................................... 51
  SECTION 5.05   Indemnification; Advancement of Expenses; Exculpation and Insurance .. 51
  SECTION 5.06   Fees and Expenses ..................................................................... 53
  SECTION 5.07   Public Announcements .............................................................. 53
  SECTION 5.08   Listing .......................................................................................... 53
  SECTION 5.09   Audited Financial Statements .................................................. 53
  SECTION 5.10   Anti-takeover Statutes .............................................................. 53
  SECTION 5.11   Tax-Free Reorganization Treatment ........................................ 54
  SECTION 5.12   Working Capital Calculation .................................................... 54
  SECTION 5.13   Securities Conversion ................................................................ 54
ARTICLE VI. CONDITIONS PRECEDENT ......................................................... 54
  SECTION 6.01   Conditions to Each Party's Obligation to Effect the Merger ...... 54
  SECTION 6.02   Conditions to Obligations of Empagio and SMB ................... 55
  SECTION 6.03   Conditions to Obligation of Parent ......................................... 56
  SECTION 6.04   Frustration of Closing Conditions ........................................... 57
ARTICLE VII. TERMINATION, AMENDMENT AND WAIVER ........................ 57
  SECTION 7.01   Termination ................................................................................. 57
  SECTION 7.02   Effect of Termination ................................................................ 58
  SECTION 7.03   Extension; Waiver ...................................................................... 59
ARTICLE VIII. SURVIVAL OF REPRESENTATIONS AND WARRANTIES ...... 59
  SECTION 8.01   Survival of Representations and Warranties ........................... 59

ARTICLE IX. GENERAL PROVISIONS ........................................................ 59
    SECTION 9.01   Notices .................................................................... 59
    SECTION 9.02   Amendment ............................................................. 60
    SECTION 9.03   Interpretation .......................................................... 60
    SECTION 9.04   Counterparts ........................................................... 61
    SECTION 9.05   Entire Agreement; No Third-Party Beneficiaries .......... 61
    SECTION 9.06   Governing Law ........................................................ 61
    SECTION 9.07   Assignment ............................................................. 61
    SECTION 9.08   Dissolution of Empagio .......................................... 61
    SECTION 9.09   Consent to Jurisdiction ............................................ 61
    SECTION 9.10   Definitions ............................................................. 62

## TABLE OF DEFINED TERMS

| **Defined Term** | **Section of Agreement** |
| --- | --- |
| Acquisition Agreement | Section 4.02(b) |
| Affiliate | Section 9.10(a) |
| Agreement | Preamble |
| Certificate | Section 2.01(b) |
| Certificate of Merger | Section 1.03 |
| Closing | Section 1.02 |
| Closing Date | Section 1.02 |
| Code | Recitals |
| Commonly Controlled Entity | Section 3.01(o)(i) |
| Company Adverse Recommendation Change | Section 4.02(b) |
| Contract | Section 9.10(b) |
| D&O Insurance | Section 5.05(c) |
| DGCL | Recitals |
| DOJ | Section 5.04 |
| EBITDA | Section 9.10(c) |
| EBITDA Auditor | Section 2.03(a) |
| EBITDA Calculation | Section 2.03(a) |
| Effective Time | Section 1.03 |
| Empagio | Preamble |
| Empagio Common Units | Section 3.02(c) |
| Empagio Financial Statements | Section 3.02(v) |
| Empagio Preferred Units | Section 3.02(c) |
| Empagio Unit Options | Section 9.10(d) |
| Empagio Warrants | Section 9.10(e) |
| Environmental Laws | Section 9.10(f) |
| Escrow Agreement | Section 2.02(a) |
| Escrow Agreement | Section 2.02(a) |
| Escrow Shares | Section 2.02(a) |
| Exchange Act | Section 3.01(f) |
| Exchange Ratio | Section 2.01(b) |
| Financials Audit | Section 5.09 |
| FTC | Section 5.04 |
| GAAP | Section 3.01(g)(i) |
| Governmental Entity | Section 3.01(f) |
| Hazardous Material | Section 9.10(g) |
| HSR Act | Section 3.01(f) |
| Indemnitees | Section 5.05(a) |
| Intellectual Property Rights | Section 3.01(t)(ix) |
| IRS | Section 3.01(p)(i) |

| | |
|---|---|
| ITA | Section 3.01(r)(xiv) |
| Knowledge | Section 9.10(h) |
| Law | Section 9.10(i) |
| Leased Real Property | Section 3.01(s)(ii) |
| Leases | Section 3.01(s)(ii) |
| Letter of Intent | Section 5.02 |
| Liens | Section 3.01(b) |
| Merger | Recitals |
| Merger Consideration | Section 2.01(b) |
| Merger Consideration Reduction Amount | Section 2.03(b) |
| Merger Sub | Preamble |
| Merger Sub Common Stock | Section 3.01(d) |
| Nasdaq | Section 3.01(f) |
| Organizational Documents | Section 3.01(a) |
| Other Antitrust Laws | Section 9.10(j) |
| Parent | Preamble |
| Parent Articles | Section 9.10(k) |
| Parent Benefit Agreement | Section 9.10(l) |
| Parent Benefit Plan | Section 3.02(o)(i) |
| Parent By-laws | Section 9.10(m) |
| Parent Common Stock | Section 3.01(c) |
| Parent Convertible Preferred Stock | Section 3.01(c) |
| Parent Disclosure Schedule | Section 3.01 |
| Parent Material Adverse Change/Effect | Section 9.10(n) |
| Parent Material Contracts | Section 3.01(k)(i) |
| Parent Participant | Section 3.01(o)(i) |
| Parent Pension Plan | Section 3.01(p)(i) |
| Parent Preferred Stock | Section 3.01(c)(ii) |
| Parent SEC Documents | Section 3.01(g)(i) |
| Parent Stock Options | Section 9.10(o) |
| Parent Warrants | Section 9.10(p) |
| Parent Working Capital | Section 9.10(q) |
| Permitted Liens | Section 9.10(r) |
| Person | Section 9.10(s) |
| Primary SMB Executives | Section 3.02(p) |
| Primary Parent Executives | Section 3.01(q) |
| Proxy Statement | Section 3.01(f) |
| Redomestication | Section 3.01(f) |
| Registered IP | Section 3.01(t)(i) |
| Representatives | Section 4.02(a) |
| Restraints | Section 6.01(d) |
| SEC | Section 3.01(f) |
| SMB | Preamble |
| SMB Benefit Agreement | Section 9.10(t) |
| SMB Common Stock | Section 2.01(b) |
| SMB Disclosure Schedule | Section 3.02 |

| | |
|---|---|
| SMB EBITDA | Section 9.10(u) |
| SMB Leased Real Property | Section 3.02(r)(ii) |
| SMB Leases | Section 3.02(r)(ii) |
| SMB Major Customer | Section 3.02(k) |
| SMB Material Adverse Effect/Change | Section 9.10(v) |
| SMB Material Contract | Section 3.02(j) |
| SMB Registered IP | Section 3.02(s) |
| SMB Stock Options | Section 9.10(w) |
| SMB Warrants | Section 9.10(x) |
| Stockholder Approval | Section 3.10(y) |
| Stockholders' Meeting | Section 3.01(h) |
| Subsidiary | Section 9.10(z) |
| Superior Proposal | Section 9.10(aa) |
| Surviving Corporation | Section 1.01 |
| Takeover Proposal | Section 9.10(bb) |
| Takeover Statutes | Section 5.10 |
| WARN | Section 3.01(o)(iv) |
| Working Capital Notice | Section 5.12 |
| Working Capital Report | Section 5.12 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Escrow Agreement |
| Exhibit B | Registration Rights Agreement |
| Exhibit C | Lock-Up Agreement |
| Exhibit D | Certificate of Incorporation |
| Exhibit E | By-laws |

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER (this "*Agreement*") dated as of February 12, 2008, among Workstream Inc., a Canadian corporation (the "*Parent*"), Workstream Merger Sub Inc., a Delaware corporation (the "*Merger Sub*"), Empagio Acquisition LLC, a Delaware limited liability company ("*Empagio*"), and SMB Capital Corporation, a Delaware corporation and wholly-owned subsidiary of Empagio ("*SMB*").

## RECITALS

WHEREAS, the Board of Directors of each of Parent, Merger Sub, Empagio and SMB has approved and declared advisable this Agreement and the merger of SMB with and into Merger Sub (the "*Merger*"), upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, prior to the Effective Time, Parent will be converted to a Delaware corporation pursuant to Section 265 of the General Corporation Law of the State of Delaware (the "*DGCL*") and Section 188 of the Canada Business Corporations Act, after which conversion "Parent" shall mean the Delaware corporation; and

WHEREAS, for United States federal income tax purposes, it is intended that the Merger shall qualify as a reorganization within the meaning of Section 368(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"), and that this Agreement shall be, and is hereby, adopted as a plan of reorganization for purposes of Section 368(a) of the Code.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, and subject to the conditions set forth herein, the parties hereto agree as follows:

ARTICLE I.
THE MERGER

SECTION 1.01    The Merger.  Upon the terms and subject to the conditions set forth in this Agreement, and in accordance with the DGCL, SMB shall be merged with and into Merger Sub at the Effective Time.  Following the Effective Time, the separate corporate existence of SMB shall cease and Merger Sub shall continue as the surviving corporation in the Merger (the "*Surviving Corporation*") and shall succeed to and assume all the rights and obligations of SMB in accordance with the DGCL.

SECTION 1.02    Closing.  The closing of the Merger (the "*Closing*") will take place at 10:00 a.m. (Eastern Time) on the third Business Day after satisfaction or (to the extent permitted by Law) waiver of the conditions set forth in Article VI (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or (to the extent permitted by Law) waiver of those conditions), at the offices of Cozen O'Connor, 1900 Market Street, Philadelphia, Pennsylvania 19103, unless another time, date or place is agreed to in writing by Parent and SMB.  The date on which the Closing occurs is referred to in this Agreement as the "*Closing Date*."

SECTION 1.03       Effective Time.  Subject to the provisions of this Agreement, the parties shall file with the Secretary of State of the State of Delaware a certificate of merger (the "*Certificate of Merger*") executed and acknowledged by the parties in accordance with the relevant provisions of the DGCL and, as soon as practicable on or after the Closing Date, shall make all other filings or recordings required under the DGCL.  The Merger shall become effective upon the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, or at such later time as Parent and SMB shall agree and shall specify in the Certificate of Merger (the time the Merger becomes effective being the "*Effective Time*").

SECTION 1.04       Effects of the Merger.  The Merger shall have the effects set forth in Section 259 of the DGCL.

SECTION 1.05       Certificate of Incorporation and By-laws.

(a)       The Certificate of Incorporation of Merger Sub immediately prior to the Effective Time shall be the Certificate of Incorporation of the Surviving Corporation from and after the Effective Time until thereafter changed or amended as provided therein or by applicable law.

(b)       The By-Laws of Merger Sub immediately prior to the Effective Time shall be the By-laws of the Surviving Corporation from and after the Effective Time until thereafter changed or amended as provided therein or by applicable law.

SECTION 1.06       Directors and Officers.  The directors and officers of Merger Sub immediately prior to the Effective Time shall become the directors and officers of the Surviving Corporation from and after the Effective Time until their respective successors are duly elected or appointed in accordance with the Certificate of Incorporation and By-laws of the Surviving Corporation and the DGCL, or until such person's earlier death, resignation or removal.

ARTICLE II.
EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE CONSTITUENT
CORPORATIONS; EXCHANGE OF CERTIFICATES

SECTION 2.01       Effect on Capital Stock.  At the Effective Time, by virtue of the Merger and without any action on the part of the holder of any shares of Parent Common Stock or Merger Sub Common Stock or any shares of capital stock of SMB or membership interests of Empagio:

(a)       Parent Equity; Merger Sub Equity.  Each share of Parent Common Stock issued and outstanding immediately prior to the Effective Time shall remain outstanding and each share of Merger Sub Common Stock issued and outstanding immediately prior to the Effective Time shall remain outstanding.  Each unexpired Parent Stock Option and Parent Warrant that is outstanding at the Effective Time shall remain outstanding.

(b)       Conversion of SMB Common Stock.  Each share of common stock, par value $.01 per share, of SMB (the "*SMB Common Stock*") issued and outstanding immediately prior to the Effective Time shall be converted into and become exchangeable for such number of shares of Parent Common Stock (the "*Exchange Ratio*") as equals 177,397,332 divided by the

sum of (i) the issued and outstanding shares of SMB Common Stock at Closing and (ii) the number of shares of SMB Common Stock issuable upon the exercise or conversion of SMB Stock Options, SMB Warrants, promissory notes or other securities convertible into shares of SMB Common Stock, subject to adjustment as provided in Section 2.03 (the "*Merger Consideration*"). At the Effective Time, all shares of SMB Common Stock shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of a certificate which immediately prior to the Effective Time represented any such shares of SMB Common Stock (each, a "*Certificate*") shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration. In the event that Empagio dissolves prior to Closing and any options, warrants, convertible promissory notes or other convertible securities become the obligations of SMB, to the extent that Parent waives the covenants contained in Section 5.13 hereunder, each then outstanding SMB Stock Option, SMB Warrant or promissory note or other security convertible into securities in SMB, if any, will by virtue of the Merger, and without any further action on the part of any holder thereof, be converted into an option, warrant, promissory note or other security to purchase that number of shares of Parent Common Stock as is determined by multiplying the number of shares of SMB Common Stock into which such SMB Stock Option, SMB Warrant, promissory note or other security is exercisable or convertible at the Effective Time by the Exchange Ratio, at an exercise price or conversion price per share of Parent Common Stock equal to the exercise price or conversion price per share of such SMB Stock Option, SMB Warrant, promissory note or other convertible security immediately prior to the Effective Time divided by the Exchange Ratio, rounded up to the nearest whole cent. If the foregoing calculation results in an exercise for a fraction of a share of Parent Common Stock, then the number of shares of Parent Common Stock to which it is subject will be rounded down to the nearest whole number of shares. The terms and conditions of each SMB Stock Option, SMB Warrant, promissory note or other convertible security will otherwise remain as set forth in the security being converted following the Effective Time. The Exchange Ratio shall not be adjusted either upward or downward as a result of fluctuations in the market value of the parties hereto.

(c)     No Fractional Shares. Notwithstanding any other provision of this Agreement, no fractional shares of Parent Common Stock shall be issued in the Merger. Each holder of SMB Common Stock who otherwise would have been entitled to a fraction of a share of Parent Common Stock shall instead receive such whole number of shares of Parent Common Stock as is determined by rounding down to the nearest whole share of Parent Common Stock the Merger Consideration to which such holder would otherwise be entitled.

(d)     Adjustment of Merger Consideration. If, after the date of this Agreement, but prior to the Effective Time, the shares of Parent Common Stock issued and outstanding shall, through a reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split or other similar change in the capitalization of the Parent (regardless of the method of effectuation of any of the foregoing, including by way of a merger or otherwise), increase or decrease in number or be changed into or exchanged for a different kind or number of securities, then the applicable Merger Consideration shall be appropriately adjusted to provide the holders of SMB Common Stock the same economic effect as contemplated by this Agreement prior to such event. For the avoidance of doubt, the conversion of Parent to a Delaware corporation shall not affect the Merger Consideration.

SECTION 2.02    Exchange of Certificates.

(a)    Exchange Procedure.  At the Closing, Empagio (or, to the extent that Empagio is liquidated prior to the Closing, the members of Empagio to which the SMB Common Stock is distributed) shall deliver to Parent the Certificates representing all of the issued and outstanding shares of SMB Common Stock.  Upon surrender of the Certificates, together with any such other documents as may reasonably be required by Parent, Empagio (or the members of Empagio, as the case may be) shall receive in exchange therefor one or more certificates representing the Merger Consideration, and the Certificate(s) so surrendered shall forthwith be cancelled; provided, however, that one or more certificates representing 67,410,986 shares (the "*Escrow Shares*") of the Merger Consideration shall be delivered to Bank of America or another third party mutually agreed upon by Parent and SMB, as escrow agent (the "*Escrow Agent*"), together with executed stock powers, to be held in escrow pursuant to the terms of the Escrow Agreement substantially in the form of Exhibit A hereto (the "*Escrow Agreement*").  Notwithstanding delivery to the Escrow Agent, the Escrow Shares shall be owned by Empagio (or the former members of Empagio, as the case may be), and they shall have all rights of ownership thereto, subject to the terms of the Escrow Agreement.

(b)    No Further Ownership Rights in SMB Common Stock.  The Merger Consideration paid upon the surrender of the Certificates in accordance with the terms of this Article II shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of SMB Common Stock formerly represented by such Certificates.  At the Effective Time, the stock transfer books of SMB shall be closed, and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the shares of SMB Common Stock that were outstanding immediately prior to the Effective Time.

(c)    Withholding Rights.  The Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of shares of SMB Common Stock such amounts as the Surviving Corporation is required to deduct and withhold with respect to the making of such payment under Code, or any provision of state, local or foreign tax law.  To the extent that amounts are so withheld and paid over to the appropriate taxing authority by the Surviving Corporation, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the shares of SMB Common Stock in respect of which such deduction and withholding was made by the Surviving Corporation.

SECTION 2.03    Reduction of Merger Consideration.

(a)    Determination of SMB EBITDA.  Parent shall engage the accounting firm of McGladrey & Pullen, LLP (the "*EBITDA Auditor*") to calculate the SMB EBITDA.  The EBITDA Auditor shall deliver its calculation of the SMB EBITDA (the "*EBITDA Calculation*"), together with all relevant documentation, to the parties to the Escrow Agreement, including the Escrow Agent, within 75 calendar days following the one-year anniversary of the Closing Date.  The EBITDA Calculation shall be the final and binding SMB EBITDA for purposes of this Section 2.03.  The costs and expenses associated with retaining the EBITDA Auditor shall be the responsibility of the Surviving Corporation.

(b)     Repayment of Reduced Merger Consideration.  Upon determination of the SMB EBITDA as provided in Section 2.03(a), in the event that the SMB EBITDA is less than $10,000,000, the Merger Consideration shall be reduced as follows (the *"Merger Consideration Reduction"*):

(i)     If the SMB EBITDA is less than $10,000,000 but greater than $9,500,000, then the Merger Consideration will be reduced by 9,097,299 shares of Parent Common Stock;

(ii)     If the SMB EBITDA is equal to or less than $9,500,000 but greater than $9,000,000, then the Merger Consideration will be reduced by 17,520,724 shares of Parent Common Stock;

(iii)     If the SMB EBITDA is equal to or less than $9,000,000 but greater than $8,500,000, then the Merger Consideration will be reduced by 25,342,476 shares of Parent Common Stock;

(iv)     If the SMB EBITDA is equal to or less than $8,500,000 but greater than $8,000,000, then the Merger Consideration will be reduced by 32,624,797 shares of Parent Common Stock;

(v)     If the SMB EBITDA is equal to or less than $8,000,000 but greater than $7,500,000, then the Merger Consideration will be reduced by 39,421,630 shares of Parent Common Stock;

(vi)     If the SMB EBITDA is equal to or less than $7,500,000 but greater than $7,000,000, then the Merger Consideration will be reduced by 45,779,957 shares of Parent Common Stock;

(vii)     If the SMB EBITDA is equal to or less than $7,000,000 but greater than $6,500,000, then the Merger Consideration will be reduced by 51,740,889 shares of Parent Common Stock;

(viii)     If the SMB EBITDA is equal to or less than $6,500,000 but greater than $6,000,000, then the Merger Consideration will be reduced by 57,340,552 shares of Parent Common Stock;

(ix)     If the SMB EBITDA is equal to or less than $6,000,000 but greater than $5,500,000, then the Merger Consideration will be reduced by 62,610,823 shares of Parent Common Stock;

(x)     If the SMB EBITDA is equal to or less than $5,500,000 but greater than $5,000,000, then the Merger Consideration will be reduced by 67,579,936 shares of Parent Common Stock;

(xi)     If the SMB EBITDA is equal to or less than $5,000,000 but greater than $4,500,000, then the Merger Consideration will be reduced by 72,272,987 shares of Parent Common Stock;

(xii)    If the SMB EBITDA is equal to or less than $4,500,000 but greater than $4,000,000, then the Merger Consideration will be reduced by 76,712,360 shares of Parent Common Stock;

(xiii)    If the SMB EBITDA is equal to or less than $4,000,000 but greater than $3,500,000, then the Merger Consideration will be reduced by 80,918,081 shares of Parent Common Stock;

(xiv)    If the SMB EBITDA is equal to or less than $3,500,000 but greater than $3,000,000, then the Merger Consideration will be reduced by 84,908,124 shares of Parent Common Stock;

(xv)    If the SMB EBITDA is equal to or less than $3,000,000 but greater than $2,500,000, then the Merger Consideration will be reduced by 88,698,665 shares of Parent Common Stock;

(xvi)    If the SMB EBITDA is equal to or less than $2,500,000 but greater than $2,000,000, then the Merger Consideration will be reduced by 92,304,302 shares of Parent Common Stock;

(xvii)    If the SMB EBITDA is equal to or less than $2,000,000 but greater than $1,500,000, then the Merger Consideration will be reduced by 95,738,242 shares of Parent Common Stock;

(xviii)    If the SMB EBITDA is equal to or less than $1,500,000 but greater than $1,000,000, then the Merger Consideration will be reduced by 99,012,464 shares of Parent Common Stock;

(xix)    If the SMB EBITDA is equal to or less than $1,000,000 but greater than $500,000, then the Merger Consideration will be reduced by 102,137,857 shares of Parent Common Stock;

(xx)    If the SMB EBITDA is equal to or less than $500,000, then the Merger Consideration will be reduced by 105,124,345 shares of Parent Common Stock.

In the event of a Merger Consideration Reduction, the Escrow Agent shall, pursuant to the terms of the Escrow Agreement, promptly return to Parent one or more Certificates representing the shares by which the Merger Consideration is to be reduced. To the extent that the Escrow Shares are not adequate in number to satisfy the Merger Consideration Reduction, then, pursuant to the terms of the Escrow Agreement, Empagio (or the former members of Empagio to which the Merger Consideration is paid at Closing) shall deliver to the Escrow Agent Certificates representing additional shares of Parent Common Stock, together with an executed stock power, sufficient in number to satisfy the Merger Consideration Reduction. Such Certificate(s) shall be cancelled and the shares of Parent Common Stock represented thereby shall no longer be outstanding and shall be deemed authorized but unissued shares of Parent Common Stock, and Empagio (or the members of Empagio, as the case may be) shall cease to have any rights with respect thereto.

ARTICLE III.
REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Representations and Warranties of Parent and Merger Sub. Except as set forth in the Annual Report on Form 10-K. of for the fiscal year ended May 31, 2007 filed on August 24, 2007 or in the disclosure schedule delivered by Parent and Merger Sub to Empagio prior to the execution of this Agreement (the *"Parent Disclosure Schedule"*) (with specific reference to the particular Section or subsection of this Agreement to which the information set forth in such disclosure schedule relates; provided, however, that any information set forth in one section of such disclosure schedule shall be deemed to apply to each other Section or subsection thereof to which its relevance is readily apparent on its face), Parent and Merger Sub jointly and severally represent and warrant to Empagio and SMB as follows:

(a)    Organization, Standing and Corporate Power. Each of Parent, its Subsidiaries and Merger Sub has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its incorporation. Each of Parent, its Subsidiaries and Merger Sub has all requisite power and authority and possesses all governmental licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold and operate its properties and other assets and to carry on its business as currently conducted, except where the failure to have such government licenses, permits, authorizations or approvals individually or in the aggregate has not had and would not reasonably be expected to have a Parent Material Adverse Effect. Each of Parent, its Subsidiaries and Merger Sub is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed individually or in the aggregate has not had and would not reasonably be expected to have a Parent Material Adverse Effect. Parent has made available to Empagio complete and accurate copies of the Parent Articles and the Parent By-laws, the Certificate of Incorporation and By-Laws of Merger Sub, and the comparable organizational documents of each other Subsidiary of Parent, in each case as amended to the date hereof (collectively, the *"Organizational Documents"*).

(b)    Subsidiaries. Section 3.01(b) of the Parent Disclosure Schedule lists each of the Subsidiaries of Parent and, for each such Subsidiary, the jurisdiction of its incorporation and a list of its directors and officers. Merger Sub does not have any Subsidiaries. All the issued and outstanding shares of capital stock of each such Subsidiary have been validly issued and are fully paid and nonassessable and are owned directly or indirectly by Parent free and clear of all pledges, liens, charges, claims, options, mortgages, restrictions, encumbrances or security interests of any kind or nature whatsoever (collectively, *"Liens"*), and free of any restriction on the right to vote, sell or otherwise dispose of such capital stock or other equity interests. Except for the capital stock of its Subsidiaries, Parent does not own, directly or indirectly, any capital stock of, or other voting securities or equity interests in, any corporation, partnership, joint venture, association or other entity.

(c)    Capital Structure of Parent.

(i)    On the date hereof, the authorized capital stock of Parent consists of an unlimited number of common shares, no par value (the "*Parent Common Stock*"), an unlimited number of Class A Preferred Shares, no par value (the "*Parent Preferred Stock*") and an unlimited number of Series A Convertible Preferred Shares, no par value (the "*Parent Convertible Preferred Stock*"). At the close of business on January 31, 2008, (i) 52,519,744 shares of Parent Common Stock were issued and outstanding, (ii) no shares of Parent Preferred Stock were issued and outstanding; and (iii) no shares of Parent Convertible Preferred Stock were issued and outstanding. As of January 31, 2008, no shares of Parent Common Stock, Parent Preferred Stock or Parent Convertible Preferred Stock were reserved for issuance, except for an aggregate of 5,380,447 shares of Parent Common Stock reserved for issuance upon the exercise of Parent Stock Options pursuant to the Parent Stock Plans and 24,337,501 shares of Parent Common Stock reserved for issuance upon the exercise or conversion of Parent Warrants. Section 3.01(c) of the Parent Disclosure Schedules sets forth a true and correct capitalization table of Parent as of the date hereof. Except as otherwise specified in this Section 3.01(c), none of Parent, its Subsidiaries or Merger Sub has or is bound by any outstanding subscriptions, options, warrants, calls, convertible securities, convertible notes, convertible debentures, preemptive rights, redemption rights, stock appreciation rights, stock-based performance units or other similar rights, agreements or commitments of any character relating to the purchase or issuance of any shares of the capital stock or other equity securities of Parent, any of its Subsidiaries or Merger Sub or any securities representing the right to purchase or otherwise receive any shares of the capital stock of Parent, its Subsidiaries or Merger Sub (including any rights plan or agreement) or equity-based awards, nor is there any other agreement to which Parent, its Subsidiaries or Merger Sub is a party obligating any of them to (A) issue, transfer or sell any shares of capital stock or other equity interests of Parent, its Subsidiaries or Merger Sub or securities convertible into or exchangeable or exercisable for such shares or equity interests, (B) issue, grant, extend or enter into any such subscription, option, warrant, call, convertible securities, stock-based performance units or other similar right, agreement, arrangement or commitment, (C) redeem or otherwise acquire any such shares of capital stock or other equity interests or (D) provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, Parent, its Subsidiaries or Merger Sub. There are no bonds, debentures, notes or other indebtedness of Parent having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of Parent may vote. None of Parent, its Subsidiaries or Merger Sub is a party to any voting agreement with respect to the voting of any such securities.

(ii)    There are no stockholder agreements, voting trusts, proxies or other similar agreements, arrangements or understandings to which the Parent, its Subsidiaries or Merger Sub is a party, or by which it or they are bound, obligating the Parent, its Subsidiaries or Merger Sub with respect to any shares of capital stock of the Parent, its Subsidiaries or Merger Sub. There are no rights or obligations, contingent or otherwise (including rights of first refusal in favor of the Parent, its Subsidiaries or Merger Sub), of the Parent, its Subsidiaries or Merger Sub, to repurchase, redeem or otherwise acquire any shares of capital stock of the Parent, its Subsidiaries or Merger Sub or to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in Merger Sub, any Subsidiary or any other entity. There are no registration rights or other agreements, arrangements or understandings to which the Parent,

its Subsidiaries or Merger Sub is a party, or by which it or they are bound, obligating the Parent, its Subsidiaries or Merger Sub with respect to any shares of Parent Common Stock, Parent Preferred Stock or Parent Convertible Preferred Stock or shares of capital stock of Merger Sub or any Subsidiary.

(iii)    All outstanding shares of the Parent's capital stock are, and all shares of Parent Common Stock reserved for issuance as specified above will be duly authorized, validly issued, fully paid and nonassessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, pre-emptive right, subscription right or any similar right under any provision of the law of the issuer's jurisdiction of organization, the issuer's charter or the bylaws or any agreement to which the Parent, its Subsidiaries or Merger Sub is a party or otherwise bound.

(iv)    The Parent Common Stock constitutes the only class of securities of the Parent, its Subsidiaries or Merger Sub registered or required to be registered under the Exchange Act.

(d)    Capital Structure of Sub.    The authorized shares of capital stock of Merger Sub consist of 1,000 shares of common stock, par value $.01 per share (the "*Merger Sub Common Stock*"), 100 of which have been duly authorized and are validly issued, fully paid, non-assessable and outstanding.    All the issued and outstanding common stock of Merger Sub is, and at the Effective Time will be, owned by Parent, and there are (i) no other shares of capital stock or voting securities of Merger Sub, (ii) no securities of Merger Sub convertible into or exchangeable for shares of capital stock or voting securities of Merger Sub and (iii) no options or other rights to acquire from Merger Sub, and no obligations of Merger Sub to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of Merger Sub

(e)    Authority; Noncontravention.    Parent and Merger Sub have all requisite corporate power and authority to execute and deliver this Agreement and, subject to receipt of the Stockholder Approval, to consummate the transactions contemplated by this Agreement.    The execution and delivery of this Agreement by Parent and Merger Sub and the consummation by them of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate action on the part of Parent and Merger Sub and no other corporate proceedings on the part of Parent or Merger Sub are necessary to authorize this Agreement or to consummate the transactions contemplated hereby, subject, in the case of the consummation of the Merger and the Redomestication, to obtaining the Stockholder Approval.    This Agreement has been duly executed and delivered by Parent and Merger Sub and, assuming the due authorization, execution and delivery by each of Empagio and SMB, constitutes a legal, valid and binding obligation of Parent and Merger Sub, enforceable against them in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and to general principles of equity.    The execution and delivery of this Agreement do not, and the consummation of the Merger and the other transactions contemplated by this Agreement and compliance by Parent and Merger Sub with the provisions of this Agreement will not, conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, or result in the

creation of any Lien in or upon any of the properties or other assets of Parent, its Subsidiaries and Merger Sub under; (x) any of the Organizational Documents, (y) any loan or credit agreement, bond, debenture, note, mortgage, indenture, lease, sublease, or other Material Contract to which Parent, its Subsidiaries or Merger Sub is a party or any of their respective properties or other assets is subject or (z) subject to obtaining the Stockholder Approval and making the governmental filings and other matters referred to in Section 3.01(f), any (A) Law applicable to Parent, its Subsidiaries or Merger Sub or their respective properties or other assets or (B) order, writ, injunction, decree, judgment or stipulation, in each case applicable to Parent, its Subsidiaries or Merger Sub or their respective properties or other assets, other than, in the case of clauses (y) and (z), any such conflicts, violations, breaches, defaults, rights, losses or Liens that individually or in the aggregate have not had and would not reasonably be expected to have a Parent Material Adverse Effect.

(f)     Consents and Approvals.  No consent, approval, order or authorization of, action by or in respect of, or registration, declaration or filing with, any federal, state or foreign government, any court, administrative, regulatory or other governmental agency, commission or authority or any non-governmental self-regulatory agency, commission or authority (each, a "*Governmental Entity*") or any Person is required by or with respect to Parent, its Subsidiaries or Merger Sub in connection with the execution and delivery of this Agreement by Parent and Merger Sub or the consummation of the Merger or the other transactions contemplated by this Agreement, except for: (i) the consents and approvals set forth in Section 3.01(f) of the Parent Disclosure Schedule; (ii) the filing of all required documents in Delaware and Canada in connection with Parent's conversion from a Canadian corporation to a Delaware corporation (the "*Redomestication*"), and such filings shall have become effective; (iii) the filing of a premerger notification and report form by Parent under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (including the rules and regulations promulgated thereunder, the "*HSR Act*"), and the receipt, termination or expiration, as applicable, of approvals or waiting periods required under the HSR Act or any other applicable foreign competition, merger control, antitrust or similar law or regulation; (iv) the filing with the Securities and Exchange Commission (the "*SEC*") of (A) a proxy statement relating to the transactions contemplated hereby (as amended or supplemented from time to time, the "*Proxy Statement*") and (B) such reports under the Securities Exchange Act of 1934, as amended (including the rules and regulations promulgated thereunder, the "*Exchange Act*"), as may be required in connection with this Agreement and the transactions contemplated by this Agreement; (v) the filing of a Certificate of Merger with the Secretary of State of the State of Delaware and appropriate documents with the relevant authorities of other states in which Parent or Merger Sub is qualified to do business; (vi) approval of the listing on the Nasdaq and the Boston Stock Exchange of the Parent Common Stock to be issued as the Merger Consideration; and (vii) such other consents, approvals, orders, authorizations, actions, registrations, declarations and filings, the failure of which to be obtained or made individually or in the aggregate has not had and would not reasonably be expected to have a Parent Material Adverse Effect.

(g)     Parent SEC Documents.

(i)     Parent has filed or furnished all reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) with the SEC required to be filed or furnished by Parent since January 1, 2006 (the "*Parent SEC*

*Documents*"). As of their respective filing dates, the Parent SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act applicable to such Parent SEC Documents. Except to the extent that information contained in any Parent SEC Document has been revised, amended, supplemented or superseded by a later-filed Parent SEC Document, none of the Parent SEC Documents contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Each of the financial statements (including the related notes) of Parent included in the Parent SEC Documents was prepared in accordance with, in all material respects, the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, was prepared in accordance with generally accepted accounting principles in the United States ("*GAAP*") (except, in the case of unaudited statements, as permitted by the rules and regulations of the SEC) applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly presented in all material respects the consolidated financial position of Parent and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). None of Merger Sub or the Subsidiaries of Parent are, or have at any time since January 1, 2005 been, subject to the reporting requirements of Sections 13(a) and 15(d) of the Exchange Act.

(ii)     Parent maintains a system of "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that provides reasonable assurance (A) that records are maintained that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of Parent, (B) that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, (C) that receipts and expenditures of Parent are being made only in accordance with the authorization of management and (D) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of Parent's assets that could have a material effect on Parent's financial statements.

(iii)     Parent's "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) are reasonably designed to ensure that all information required to be disclosed by Parent in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

(iv)     Parent has not received any oral or written notification of any (A) "significant deficiency" or (B) "material weakness" in Parent's internal controls over financial reporting. There is no outstanding "significant deficiency" or "material weakness" which Parent's independent accountants certify has not been appropriately and adequately remedied by Parent. For purposes of this Agreement, the terms "significant deficiency" and "material weakness" shall have the meanings assigned to them in the Public Company Accounting Oversight Board's Auditing Standard No. 2, as in effect on the date hereof.

(h)     Proxy Statement. The Proxy Statement will, at the time of the Stockholders' Meeting, comply in all material respects with the requirements of the Exchange Act.

(i)    Absence of Certain Changes or Events.  Since November 30, 2007, there has not been any Parent Material Adverse Change.  During the period from November 30, 2007 through the date of this Agreement, Parent, its Subsidiaries and Merger Sub have conducted their businesses only in the ordinary course consistent with past practice, except as contemplated by this Agreement.

(j)    Litigation.  Except as disclosed in the Parent SEC Documents, there is no suit, action or proceeding pending or, to the Knowledge of Parent, threatened against Parent, any of its Subsidiaries or Merger Sub or any of their respective assets that individually or in the aggregate has had or would reasonably be expected to have a Parent Material Adverse Effect, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against, or, to the Knowledge of Parent, investigation by any Governmental Entity involving, Parent, its Subsidiaries or Merger Sub or any of their respective assets that individually or in the aggregate has had or would reasonably be expected to have a Parent Material Adverse Effect, nor is there any inquiry or internal investigation being conducted by Parent, its Subsidiaries or Merger Sub, the results of which would reasonably be expected to have a Parent Material Adverse Effect.

(k)    Contracts.

(i)    Section 3.01(k) of the Parent Disclosure Schedule sets forth a list of all Material Contracts to which Parent, its Subsidiaries or Merger Sub is a party.  For purposes of this Section 3.01(k)(i), *"Parent Material Contract"* means:

(A)    any Contract that would be required to be filed by Parent as a "material agreement" pursuant to Item 601(A)(10) of Regulation S-K under the Securities Act or disclosed by Parent on a Current Report on Form 8-K;

(B)    any Contract that if terminated or subject to a default by any party thereto would reasonably be expected to have a Parent Material Adverse Effect;

(C)    any Contract that, as of February 1, 2008, resulted in annualized gross revenues to Parent, any of its Subsidiaries or Merger Sub of at least $500,000;

(D)    any Contract that, as of February 1, 2008, had a maximum possible annualized liability or obligation on the part of Parent, any of its Subsidiaries or Merger Sub of more than $250,000;

(E)    any Contract for development services related to Intellectual Property Rights of Parent, whether by an employee or independent contractor;

(F)    any Contract that imposes any material restriction on the right or ability of the Parent, a Subsidiary or Merger Sub: (1) to compete with, or solicit any customer of, any other Person; (2) to acquire any product or other asset or any services from any other Person; (3) to solicit, hire or retain any Person as an employee, consultant or independent contractor; (4) to develop, sell, supply, distribute, offer, support or service any product or any technology or other asset to or for any other Person; (5) to perform services for any other Person; or (6) to transact business with any other Person;

(G)    any Contract that requires Parent, a Subsidiary or Merger Sub to give favored pricing to any customers or potential customers;

(H)    any Contract involving the lease of real property;

(I)    any employment, severance, consulting, personal services, non-competition or indemnification Contracts with any officer of Parent, a Subsidiary or Merger Sub;

(J)    any Contract that is material to the operation of Parent's business that contains a change of control provision that would be triggered by the consummation of the transactions contemplated by this Agreement; and

(K)    any Contract between or among Parent, a Subsidiary or Merger Sub, on the one hand, and any director, officer or Affiliate of Parent, a Subsidiary or Merger Sub or any person that beneficially owns 5% or more of the outstanding shares of Parent Common Stock (including, in each case, any "associates" or members of the "immediate family" (as such terms are defined in Rule 12b-2 and Rule 16a-1 of the Exchange Act, respectively) of any such person), on the other hand.

(ii)    Each Parent Material Contract is a valid and binding obligation of Parent, its Subsidiaries or Merger Sub, as the case may be, and, to the Knowledge of Parent, a valid and binding obligation of each other party thereto. None of Parent, any of its Subsidiaries or Merger Sub or, to the Knowledge of Parent, any other party is in breach of, or in default under, or has repudiated, and no event has occurred which, with notice or lapse of time or both, would constitute a breach of, or a default under, any such Parent Material Contract, except for such breach, default or repudiation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect. Parent has made available to Empagio a true and correct copy of each Parent Material Contract.

(iii)    None of Parent, its Subsidiaries or Merger Sub has made, arranged or modified in any material way any extension of credit in the form of a personal loan to any executive officer or director of Parent.

(l)    <u>Customers</u>. Section 3.01(l) of the Parent Disclosure Schedule sets forth a true and complete list of the top 20 revenue producing customers of Parent, its Subsidiaries and Merger Sub for the year ended December 31, 2007 (each, a "*Major Customer*"). Parent has not received written notice from any Major Customer stating that it has terminated or intends to terminate its relationship with Parent, its Subsidiaries or Merger Sub. To its Knowledge, Parent is not in breach or default under any Contract with any Major Customer, except where any such breach has not had or would not reasonably be expected to have a Parent Material Adverse Effect.

(m)    <u>Compliance with Law</u>. The businesses of Parent, its Subsidiaries and Merger Sub have been conducted in accordance with applicable Laws except where any such noncompliance has not had or would reasonably not be expected to have a Parent Material Adverse Effect. Since January 1, 2006, none of Parent, its Subsidiaries or Merger Sub has received notice of any violation (or any investigation with respect thereto) of any such Laws, and

none of Parent, its Subsidiaries or Merger Sub is in default with respect to any order, writ, judgment, award, injunction or decree of any Governmental Entity applicable to any of its assets, properties or operations except where any such failure has not had or would reasonably not be expected to have a Parent Material Adverse Effect.

(n)     Environmental Matters.

(i)     Each of Parent, its Subsidiaries and Merger Sub is and has been in compliance with all Environmental Laws except where the failure to be in compliance would not have a Parent Material Adverse Effect. Each of Parent, its Subsidiaries and Merger Sub has in effect all licenses, permits and other authorizations required under all Environmental Laws and all such licenses, permits and other authorizations are in full force and effect except where the failure to have any such license, permit or authorization would not have a Parent Material Adverse Effect. Each of Parent, its Subsidiaries and Merger Sub is in compliance with all such licenses, permits and authorizations except where the failure to be in compliance would not have a Parent Material Adverse Effect.

(ii)     There is no material proceeding pending or, to the Knowledge of Parent, threatened against Parent, its Subsidiaries or Merger Sub or any of their respective properties under any Environmental Law, and Parent, its Subsidiaries and Merger Sub have not received any notice of material violation or potential liability under any Environmental Laws from any Person or any Governmental Entity inquiry, request for information, or demand letter under any Environmental Law relating to operations or properties of Parent, its Subsidiaries or Merger Sub. None of Parent, its Subsidiaries or Merger Sub or any of their respective properties or operations is subject to any orders arising under Environmental Laws. None of Parent, its Subsidiaries or Merger Sub has entered into any agreement pursuant to which it has assumed or will assume any material liability under Environmental Laws, including without limitation, any obligation for costs of remediation, of any other Person.

(iii)     To the Knowledge of Parent, there has been no release or threatened release of any Hazardous Material, on, at or beneath any of the Leased Real Property or other properties currently or previously owned or operated by Parent, its Subsidiaries or Merger Sub or any surface waters or groundwaters thereon or thereunder which requires any material disclosure, investigation, cleanup, remediation, monitoring, abatement, deed or use restriction by it, or which would be expected to give rise to any actual or alleged material liability for personal injury, property damage, natural resources damage or other material liability or damages to Parent, its Subsidiaries or Merger Sub under any Environmental Laws.

(iv)     To the Knowledge of Parent, none of Parent, its Subsidiaries or Merger Sub has sent or arranged for the disposal of any Hazardous Material, or transported any Hazardous Material, that reasonably would be expected to give rise to any material liability for any damages or costs of investigation, remediation or any other action to respond to the release or threatened release of any Hazardous Material.

(v)     Parent has made available to Empagio copies of all environmental studies, investigations, reports or assessments concerning Parent, its Subsidiaries, Merger Sub,

the Leased Real Property and any real property currently or previously owned or operated by Parent, its Subsidiaries or Merger Sub.

    (o)   <u>Absence of Changes in Parent Benefit Plans; Labor Relations</u>.

    (i)    From the date of the most recent audited financial statements included in the Parent SEC Documents to the date of this Agreement, there has not been any adoption, material amendment or termination by Parent, its Subsidiaries or Merger Sub or any Commonly Controlled Entity of any employment, bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock appreciation, restricted stock, stock option, phantom stock, performance, retirement, thrift, savings, stock bonus, paid time off, perquisite, fringe benefit, vacation, severance, disability, death benefit, hospitalization, medical, welfare benefit or other plan, program, policy, arrangement, agreement or understanding (whether or not legally binding) maintained, contributed to or required to be maintained or contributed to by Parent, its Subsidiaries or Merger Sub or any other person or entity that, together with Parent, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code (each, a "*Commonly Controlled Entity*"), in each case providing benefits to any current or former director, officer, employee, independent contractor or consultant of Parent, its Subsidiaries or Merger Sub or any Commonly Controlled Entity (each, a "*Parent Participant*"), but not including the Parent Benefit Agreements (all such plans, programs, policies, arrangements, agreements and understandings, including any such plan, program, policy, arrangement, agreement or understanding entered into or adopted on or after the date of this Agreement, collectively, the "*Parent Benefit Plans*"), or any change in any actuarial or other assumption used to calculate funding obligations with respect to any Parent Pension Plan, or any change in the manner in which contributions to any Parent Pension Plan are made or the basis on which such contributions are determined, other than amendments or other changes as required to ensure that such Parent Pension Plan is not then out of compliance with applicable law, or reasonably determined by Parent to be necessary or appropriate to preserve the qualified status of a Plan Pension Plan under Section 401(a) of the Code. Except as disclosed in the Parent SEC Documents and in Section 3.01(p) of the Parent Disclosure Schedule, as of the date of this Agreement, there are not any other material Parent Benefit Agreements.

    (ii)    None of Parent, its Subsidiaries or Merger Sub is a party to any collective bargaining agreement or other labor union contract or similar scheme or arrangement applicable to its employees nor does Parent have Knowledge of any activities or proceedings of any labor union to organize any such employees.

    (iii)    Each of Parent, its Subsidiaries and Merger Sub is in compliance with all applicable Laws relating to employment and employment practices, the classification of employees, wages, hours, collective bargaining, unlawful discrimination, civil rights, safety and health, workers' compensation and terms and conditions of employment except where such failure has not had or would reasonably not be likely to have a Parent Material Adverse Effect. There are no charges with respect to or relating to any of Parent, its Subsidiaries or Merger Sub pending or, to the Knowledge of Parent, threatened before the Equal Employment Opportunity Commission or any state, local or foreign agency responsible for the prevention of unlawful employment practices Since January 1, 2006, none of Parent, its Subsidiaries or Merger Sub has received any notice from any national, state, local or foreign agency responsible for the

enforcement of labor or employment Laws of an intention to conduct an investigation of any of Parent, its Subsidiaries or Merger Sub and no such investigation is in progress.

(iv)    There has been no "mass layoff" or "plant closing" as defined by the Worker Adjustment and Retraining Notification Act or any similar state or local "plant closing" Law ("*WARN*") with respect to the current or former employees of Parent, its Subsidiaries or Merger Sub.

(p)    ERISA Compliance.

(i)    Section 3.01(p) of the Parent Disclosure Schedule contains a complete and accurate list of each material Parent Benefit Plan that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) (sometimes referred to herein as a "*Parent Pension Plan*"), each material Parent Benefit Plan that is an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) and all other material Parent Benefit Plans and material Parent Benefit Agreements in effect as of the date of this Agreement. Parent has made available to Empagio complete and accurate copies of (A) each such Parent Benefit Plan and Parent Benefit Agreement, (B) the two most recent annual reports on Form 5500 filed with the Internal Revenue Service (the "*IRS*") with respect to each Parent Benefit Plan (if any such report was required under applicable law), (C) the most recent summary plan description for each Parent Benefit Plan for which a summary plan description is required under applicable law and (D) each trust agreement and insurance or group annuity contract relating to any Parent Benefit Plan. Each Parent Benefit Plan and Parent Benefit Agreement has been administered in accordance with its terms and with the applicable provisions of ERISA, the Code and all other applicable laws and the terms of all applicable collective bargaining agreements, except where such non-compliance has not had and would not reasonably be expected to have a Parent Material Adverse Effect.

(ii)    All Parent Pension Plans intended to be tax qualified have received favorable determination letters from the IRS with respect to all tax law changes with respect to which the IRS is currently willing to provide a determination letter, to the effect that such Parent Pension Plans are qualified and exempt from Federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, no such determination letter has been revoked (nor, to the Knowledge of Parent, has revocation been threatened) and, to the Knowledge of Parent, no event has occurred since the date of the most recent determination letter or application therefor relating to any such Parent Pension Plan that has had or would reasonably be expected to result in a material liability to Parent. Parent has delivered or made available to Empagio a complete and accurate copy of the most recent determination letter received prior to the date hereof with respect to each Parent Pension Plan.

(iii)    Neither Parent nor, within the last six years, any Commonly Controlled Entity, (A) has maintained, contributed to or been required to contribute to, or has any actual or contingent liability under, any Parent Benefit Plan that is subject to Title IV of ERISA or Section 412 of the Code or that is otherwise a defined benefit pension plan and (B) has any unsatisfied liability under Title IV of ERISA or Section 412 of the Code which would reasonably be expected to have a Parent Material Adverse Effect.

(iv)    All reports, returns and similar documents with respect to all Parent Benefit Plans required to be filed with any Governmental Entity or distributed to any Parent Benefit Plan participant have been duly and timely filed or distributed, except where such failure has not had and would not reasonably be expected to result in a material liability to Parent. None of Parent, any of its Subsidiaries, Merger Sub or any Commonly Controlled Entity has received notice of, and to the Knowledge of Parent, there are no investigations by any Governmental Entity with respect to, termination proceedings or other claims (except claims for benefits payable in the normal operation of the Parent Benefit Plans), suits or proceedings against or involving any Parent Benefit Plan or Parent Benefit Agreement or asserting any rights or claims to benefits under any Parent Benefit Plan or Parent Benefit Agreement that would reasonably be expected to have a Parent Material Adverse Effect, and, to the Knowledge of Parent, there are not any facts that would reasonably be expected to result in a Parent Material Adverse Effect in the event of any such investigation, claim, suit or proceeding.

(v)    Except where such failure has not had and would not reasonably be expected to result in a material liability to Parent, all contributions, premiums and benefit payments under or in connection with the Parent Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the Parent Benefit Plans have been timely made or have been reflected on the most recent consolidated balance sheet filed or incorporated by reference into the Parent SEC Documents. No Parent Pension Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(vi)    With respect to each Parent Benefit Plan, (A) to the Knowledge of Parent, there has not occurred any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) that would reasonably be expected to result in a material liability to Parent and (B) to the Knowledge of Parent, none of Parent, any of its Subsidiaries, Merger Sub or any of their respective officers, directors or employees has engaged in any transaction or acted in a manner, or failed to act in a manner, that would reasonably be expected to subject Parent to any liability for breach of fiduciary duty under ERISA that would reasonably be expected to result in a material liability to Parent. There has not been any "reportable event" (as that term is defined in Section 4043 of ERISA) for which the 30-day reporting requirement has not been waived with respect to any Parent Benefit Plan during the last five years.

(vii)    To the Knowledge of Parent, each of Parent, its Subsidiaries and Merger Sub complies in all material respects with the applicable requirements of Section 4980B(f) of the Code or any similar state or local law with respect to each Parent Benefit Plan that is a group health plan, as such term is defined in Section 5000(b)(1) of the Code or such state or local law. Except as required by Section 4980B(f) of the Code, no Parent Benefit Plan or Parent Benefit Agreement that is an employee welfare benefit plan or that provides welfare benefits provides benefits after termination of employment

(viii)    (A) no Parent Participant will be entitled to any additional compensation, severance or other benefits or any acceleration of the time of payment or vesting of any compensation, severance or other benefits as a result of the Merger or any other transaction contemplated by this Agreement (alone or in combination with any other event) or any benefits the value of which will be calculated on the basis of the Merger or any other

transaction contemplated by this Agreement (alone or in combination with any other event), and (B) none of the execution and delivery of this Agreement, the obtaining of the Stockholder Approval or the consummation of the Merger or any other transaction expressly contemplated by this Agreement will (including as a result of any termination of employment on or following the Effective Time) (1) entitle any Parent Participant to severance, termination, change in control or similar pay or benefits, (2) accelerate the time of payment or vesting, or trigger any payment or funding (through a grantor trust or otherwise) of, compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, or increase the cost of, any Parent Benefit Plan or Parent Benefit Agreement or (3) result in any breach or violation of, or a default under, any Parent Benefit Plan or Parent Benefit Agreement.

(ix)    No deduction by Parent, any of its Subsidiaries or Merger Sub in respect of any "applicable employee remuneration" (within the meaning of Section 162(m) of the Code) has been disallowed or is subject to disallowance by reason of Section 162(m) of the Code, except where such disallowance has not had and would not reasonably be expected to result in a Parent Material Adverse Effect.

(x)    Each Parent Benefit Agreement is in form and operation in good faith compliance with the provisions of Section 409A of the Code.

(q)    No Excess Parachute Payments. Other than payments that may be made to the individuals set forth in Section 3.01(q) of the Parent Disclosure Schedule (the "*Primary Company Executives*"), (i) no amount or other entitlement or economic benefit that would be received (whether in cash or property or the vesting of property) as a result of the execution and delivery of this Agreement, the obtaining of the Stockholder Approval, the consummation of the Merger or any other transaction contemplated by this Agreement (including as a result of termination of employment on or following the Effective Time) by or for the benefit of any Parent Participant who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any Parent Benefit Plan, Parent Benefit Agreement or other compensation arrangement would be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code), and (ii) no such disqualified individual is entitled to receive any additional payment (*e g* , any tax gross up or other payment) from Parent, Empagio, the Surviving Corporation or any other person in the event that the excise tax required by Section 4999(a) of the Code is imposed on such disqualified individual.

(r)    Taxes.

(i)    Each of Parent, its Subsidiaries and Merger Sub has filed or has caused to be filed in a timely manner (within any applicable extension period) all material tax returns required to be filed. All such tax returns are complete and accurate in all material respects and have been prepared in compliance in all material respects with all applicable Laws and regulations. Each of Parent, its Subsidiaries and Merger Sub has timely paid or caused to be paid (or Parent has paid on its behalf) all taxes due and owing, and the most recent financial statements contained in the Parent SEC Documents reflect an adequate reserve, determined in accordance with GAAP, consistently applied, for all material taxes payable by Parent and its Subsidiaries for all taxable periods and portions thereof accrued through the date of such financial statements.

(ii)     To the Knowledge of Parent, no tax return of Parent, any of its Subsidiaries or Merger Sub is or has been within the last five years under audit or examination by any taxing authority, and no written notice has been received by Parent, its Subsidiaries or Merger Sub that any audit, examination or similar proceeding is pending, proposed or asserted with regard to any taxes or tax returns of Parent, its Subsidiaries or Merger Sub. There is no deficiency, refund litigation, proposed adjustment or matter in controversy with respect to any material amount of taxes due and owing by Parent, its Subsidiaries or Merger Sub. Each deficiency resulting from any completed audit or examination relating to taxes by any taxing authority has been timely paid or is being contested in good faith and has been reserved for on the books of Parent. The general statute of limitations with respect to federal income taxes as set forth in Section 6501 of the Code is closed with respect to the tax returns of Parent, its Subsidiaries and Merger Sub for all years through 2003. There is no currently effective agreement or other document extending, or having the effect of extending, the period of assessment or collection of any taxes of Parent, its Subsidiaries or Merger Sub, nor has any written request been made for any such extension, and no currently effective power of attorney (other than powers of attorney authorizing employees of Parent, its Subsidiaries or Merger Sub to act on behalf of Parent, its Subsidiaries or Merger Sub) with respect to any taxes has been executed or filed with any taxing authority.

(iii)     Except for any amount which may be realized as a result of the Redomestication, none of Parent, its Subsidiaries or Merger Sub will be required to include in a taxable period ending after the Effective Time a material amount of taxable income attributable to income that accrued (for purposes of the financial statements of Parent included in the Parent SEC Documents) in a prior taxable period (or portion of a taxable period) but was not recognized for tax purposes in any prior taxable period as a result of (A) an open transaction disposition made on or before the Effective Time, (B) a prepaid amount received on or prior to the Effective Time, (C) the installment method of accounting, (D) the completed contract method of accounting, (E) the long-term contract method of accounting, (F) the cash method of accounting or Section 481 of the Code or (G) any comparable provisions of state or local tax law, domestic or foreign, or for any other reason, other than any amounts that are specifically reflected in a reserve for taxes on the financial statements of Parent included in the Parent SEC Documents.

(iv)     Parent, its Subsidiaries and Merger Sub have complied in all material respects with all applicable statutes, laws, ordinances, rules and regulations relating to the payment and withholding of any material amount of taxes (including the withholding of taxes pursuant to Sections 1441, 1442, 3121 and 3402 of the Code and similar provisions under any federal, state, local or foreign tax laws) and have, within the time and the manner prescribed by law, withheld from and paid over to the proper governmental authorities all material amounts required to be so withheld and paid over under applicable laws.

(v)     None of Parent, its Subsidiaries or Merger Sub has within the last two years constituted either a "distributing corporation" or a "controlled corporation" as such terms are defined in Section 355 of the Code in a distribution of stock qualifying or intended to qualify for tax-free treatment (in whole or in part) under Section 355(a) or 361 of the Code.

(vi)     None of Parent, its Subsidiaries or Merger Sub joins or has joined, for any taxable period in the filing of any affiliated, aggregate, consolidated, combined or unitary

tax return other than consolidated tax returns for the consolidated group of which the Company is the common parent.

(vii)     None of Parent, its Subsidiaries or Merger Sub has ever entered into a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(viii)     No written claim has ever been made by any authority in a jurisdiction where any of Parent, its Subsidiaries or Merger Sub does not file a tax return that Parent, its Subsidiaries or Merger Sub is, or may be, subject to a material amount of tax by that jurisdiction.

(ix)     Other than with respect to the consolidated group of corporations of which Parent is the common parent, none of Parent, its Subsidiaries or Merger Sub is a party to or bound by any tax sharing agreement, tax indemnity obligation or similar agreement, arrangement or practice with respect to taxes (including any advance pricing agreement, closing agreement or other agreement relating to taxes with any taxing authority).

(x)     No taxing authority has asserted in writing any material liens for taxes with respect to any assets or properties of Parent, its Subsidiaries or Merger Sub that have not otherwise been paid or satisfied, except for statutory liens for taxes not yet due and payable.

(xi)     None of Parent, its Subsidiaries or Merger Sub has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(xii)     None of Parent, its Subsidiaries or Merger Sub (A) is, to the Knowledge of Parent, a "passive foreign investment company" within the meaning of Section 1297(a) of the Code and the Treasury Regulations promulgated thereunder or (B) has ever made an election under Section 1362 of the Code to be treated as an S corporation for federal income tax purposes or made a similar election under any comparable provision of any tax law.

(xiii)     None of Parent, its Subsidiaries or Merger Sub has taken any action or knows of any fact, agreement, plan or circumstance that is reasonably likely to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

(xiv)     There are no circumstances existing prior to the Redomestication which could, in themselves, result in the application of any of Sections 80 to 80.03 of the Income Tax Act of Canada (the "*ITA*") or any equivalent provincial provisions to Parent. Parent has not made any election pursuant to Section 80.04 of the ITA or any equivalent provincial provision in which it is an eligible transferee. Parent has not filed an agreement pursuant to Section 191.3 of the ITA or any equivalent provincial provision and has not claimed any reserve under any of Sections 40(1)(a)(iii) or 20(1)(n) of the ITA or any equivalent provincial provision of any amount that could be included in its income for any period ending after the Redomestication in respect of any such reserve.

(xv)     As used in this Agreement (A) "tax" or "taxes" shall include (whether disputed or not) all (x) federal, state, local and foreign (including Canadian provincial)

income, property, sales, use, excise, withholding, payroll, employment, social security, value-added, ad valorem, capital gain, alternative minimum, transfer, franchise, capital stock, net worth and other taxes, including taxes based on or measured by gross receipts, profits, sales, use or occupation, tariffs, levies, impositions, assessments, duties and similar governmental charges or fees of any kind whatsoever, including any interest, penalties and additions with respect thereto, (y) liability for the payment of any amounts of the type described in clause (x) as a result of being or having been a member of an affiliated, consolidated, combined, unitary or aggregate group and (z) liability for the payment of any amounts as a result of being or having been party to any tax sharing agreement or as a result of any express or implied obligation to indemnify any other person with respect to the payment of any amounts of the type described in clause (x) or (y); (B) "taxing authority" means any Federal, state, local or foreign government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising tax regulatory authority; and (C) "tax return" or "tax returns" means all returns, declarations of estimated tax payments, claims for refund, disclosure statements (including any statement pursuant to Treasury Regulation Section 1.6011-4(a)), forms, reports, estimates, information returns and statements, including any related or supporting information with respect to any of foregoing, filed or to be filed with any taxing authority in connection with the determination, assessment, collection or administration of any taxes.

      (s)    Real Property.

         (i)    None of Parent, its Subsidiaries or Merger Sub owns any real property.

         (ii)    Section 3.01(s) of the Parent Disclosure Schedule sets forth a complete and accurate list of all material real property leased by Parent, its Subsidiaries and Merger Sub (the "*Leased Real Property*") Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect, (A) all leases (including subleases) of real property under which Parent, its Subsidiaries or Merger Sub is a lessee or sublessee (the "*Leases*") are in full force and effect and (B) none of Parent, its Subsidiaries or Merger Sub, nor, to the Knowledge of Parent, any other party to any such Lease, is in default under any of the Leases, and no event has occurred which, with notice or lapse of time or both, would constitute a default by Parent, its Subsidiaries or Merger Sub under any of the Leases. The transactions contemplated by this Agreement do not require the consent of any other party to a Lease. None of Parent, its Subsidiaries or Merger Sub has subleased, licensed or otherwise granted anyone the right to use or occupy any Leased Real Property or any portion thereof, and none of Parent, its Subsidiaries or Merger Sub has collaterally assigned or granted any other security interest in any such leasehold estate or any interest therein.

      (t)    Intellectual Property.

         (i)    Parent, its Subsidiaries and Merger Sub own all right, title and interest to, or are validly licensed or otherwise have the right to use, all Intellectual Property Rights used in the business of Parent, its Subsidiaries and Merger Sub, except for such Intellectual Property Rights the failure of which to own, license or otherwise have the right to use, individually or in the aggregate, has not had and would not reasonably be expected to have a Parent Material Adverse Effect. Section 3.01(t) of the Parent Disclosure Schedule sets forth, as

of the date hereof, a complete and accurate list of: (A) all patents and applications therefor, registered trademarks and applications therefore, service marks and other designations of origin, domain name registrations (if any) and copyright registrations (if any) owned by Parent, its Subsidiaries or Merger Sub (collectively, the *"Registered IP"*) and (B) all options, rights, licenses or interests of any kind relating to Intellectual Property Rights that are material to Parent, its Subsidiaries and Merger Sub, taken as a whole, granted (1) to Parent, its Subsidiaries or Merger Sub (other than software licenses for generally available software), and (2) by Parent, its Subsidiaries or Merger Sub to any other person.

(ii)      To the Knowledge of Parent, none of Parent, its Subsidiaries or Merger Sub has infringed upon any Intellectual Property Rights of any other person, except for any such infringement that, individually or in the aggregate, has not had and would not reasonably be expected to have a Parent Material Adverse Effect. No claims are pending or, to the Knowledge of Parent, threatened, nor are there any outstanding judgments, injunctions, orders or decrees as of the date of this Agreement, against Parent, its Subsidiaries or Merger Sub by any person with respect to the ownership, validity, enforceability, effectiveness, sale, manufacture or use in the business of Parent, its Subsidiaries and Merger Sub of any Intellectual Property Right, except for such claims, judgments, injunctions, orders or decrees that, individually or in the aggregate, have not had and would not reasonably be expected to have a Parent Material Adverse Effect. To the Knowledge of Parent, no other person has interfered with, infringed upon, misappropriated, diluted or otherwise come into conflict with any Intellectual Property Rights of Parent, its Subsidiaries or Merger Sub, except for any such interference, infringement, misappropriation or other conflict that, individually or in the aggregate, has not had and would not reasonably be expected to have a Parent Material Adverse Effect.

(iii)     Parent, its Subsidiaries and Merger Sub have used commercially reasonable efforts to maintain their trade secrets in confidence, including the requirement of certain employees of Parent, its Subsidiaries and Merger Sub to execute confidentiality agreements with respect to intellectual property developed for or obtained from Parent, its Subsidiaries and Merger Sub. Without limiting the generality of the foregoing:

(A)      all documents and instruments reasonably necessary in Parent's sole discretion to establish, secure and perfect the rights of the Parent, its Subsidiaries and Merger Sub in the Registered IP have been validly executed, delivered and filed in a timely manner with the appropriate Governmental Entity, except where such failure would not reasonably be expected to have a Parent Material Adverse Effect;

(B)      each Person who is or was an employee of Parent, its Subsidiaries or Merger Sub and who is or was substantively and materially involved in the creation or development of any Intellectual Property Rights has signed or otherwise been subject to an irrevocable assignment of Intellectual Property Rights to Parent or any Subsidiary for which such Person is or was an employee; and

(C)      no Contract limits or restricts the ability of Parent, its Subsidiaries or Merger Sub to use, exploit, assert or enforce any of its Intellectual Property Rights.

(iv)    No interference, opposition, reissue, reexamination or other legal proceeding of any nature is or has been pending or threatened in which the scope, validity or enforceability of any Intellectual Property Right of Parent, any Subsidiary or Merger Sub is being, or has been contested or challenged except where such interference, opposition, reissue, reexamination or proceeding would not reasonably be expected to have a Parent Material Adverse Effect.

(v)    Neither the execution, delivery or performance of this Agreement, nor the consummation of any of the transactions contemplated hereby, will, with or without notice or the lapse of time or both, result in or give any other Person the right or option to cause or declare: (A) a loss of, or Encumbrance on, any Intellectual Property Right; (B) the release, disclosure or delivery of any source code by any Person; (C) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any Intellectual Property Right; or (iv) a violation of any third party Intellectual Property Rights.

(vi)    Except to the extent there would not reasonably be expected to have a Parent Material Adverse Effect, with respect to third party software used in any product of Parent, its Subsidiaries or Merger Sub:

(A)    the license, sublicense, agreement or permission covering the software is legal, valid, binding, enforceable and in full force and effect;

(B)    the license, sublicense, agreement or permission will continue to be legal, valid, binding and enforceable, and in full force and effect following the consummation of the transactions contemplated in this Agreement; and

(C)    to the Knowledge of Parent, no party to the license, sublicense, agreement or permission is in breach or default, and no event has occurred that with notice or lapse of time or both would constitute a breach or default or permit termination, modification or acceleration thereunder.

(vii)    No Intellectual Property Rights of Parent contain any bug, defect or error that materially and adversely affects the use, functionality or performance of such Intellectual Property Rights.

(viii)    No Intellectual Property Rights of Parent currently contained in a product of Parent, any Subsidiary or Merger Sub contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing, any of the following functions: (A) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (B) damaging or destroying any data or file without the user's consent.

(ix)    As used in this Agreement, *"Intellectual Property Rights"* means, collectively, whether arising under the laws of the United States or any other state, country or jurisdiction: (A) ideas, formulas, patterns, designs, utility models, compositions, programs, methods, inventions, know-how, manufacturing and production and all other processes,

procedures and techniques, research and development information and technical data (whether patentable or unpatentable and whether or not reduced to practice) and other trade secrets and confidential information, patents, patent applications and patent disclosures; (B) trademarks, service marks, trade dress, trade names, logos and corporate names (in each case, whether registered or unregistered) and registrations and applications for registration thereof; (C) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof; (D) computer software, data, data bases and documentation thereof; and (E) domain name registrations.

(u)    Voting Requirements. The Stockholder Approval is the only vote of the holders of any class or series of capital stock of Parent necessary to adopt this Agreement and approve the transactions contemplated hereby.

(v)    Brokers and Finders. No broker, finder or similar intermediary has acted for or on behalf of, or is entitled to any broker's, finder's or similar fee or other commission from Parent, any of its Subsidiaries or Merger Sub in connection with this Agreement or any of the transactions contemplated hereby.

(w)    Opinion of Financial Advisor. The Board of Directors of Parent has received the oral opinion of its financial advisor, Roth Capital Partners, LLC, to the effect that, as of the date of such opinion, the Exchange Ratio is fair, from a financial point of view, to the holders of Parent Common Stock. A true and correct copy of the written opinion of Roth Capital Partners, LLC will be furnished to SMB promptly following its receipt by Parent.

(x)    Title to Property. Each of Parent, its Subsidiaries and Merger Sub has good and valid title to, or a valid leasehold interest in, all the properties and assets which it purports to own or lease, including all the properties and assets reflected in the consolidated Balance Sheet of Parent and its Subsidiaries in its most recently filed Parent SEC Document (except for personal property sold since the date of the said Balance Sheet in the ordinary course of business).

(y)    Foreign Corrupt Practices. None of Parent, its Subsidiaries or Merger Sub nor, to the Knowledge of Parent, any director, officer, agent, employee or other Person acting on behalf thereof has, in the course of its actions therefor or on behalf thereof: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

(z)    Insurance. Section 3.01(z) of the Parent Disclosure Schedule contains a complete and accurate list of all policies of fire, liability, workers' compensation, indemnity and other forms of insurance owned, held by or applicable to Parent, its Subsidiaries and Merger Sub and their assets, properties and operations and such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid or will be paid in accordance with the applicable terms, and no notice of cancellation

or termination has been received with respect to any such policy. There are no pending or, to the Knowledge of Parent, threatened claims under any insurance policy.

(aa)    No Default. None of Parent, its Subsidiaries or Merger Sub is in violation in any material respect of any term of (i) its Organizational Documents, (ii) any agreement or instrument related to indebtedness for borrowed money or any other agreement to which it is a party or by which it is bound, or (iii) any Law applicable to it or any of its properties or assets, except in the case of (ii) or (iii), for violations that have not had and would not be reasonably expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(bb)    Undisclosed Liabilities. Except as set forth in the Parent SEC Documents or otherwise disclosed hereunder, and except for such liabilities and obligations incurred in the ordinary course of business and which have not had, and would not be reasonably expected to have, individually or in the aggregate, a Parent Material Adverse Effect, Parent does not have any liabilities or obligations of any nature, whether or not accrued, contingent or otherwise, and there is no existing condition, situation or set of circumstances that could reasonably be expected to result in such a liability or obligation.

SECTION 3.02    Representations and Warranties of Empagio and SMB. Except as set forth in the disclosure schedule delivered by Empagio and SMB to Parent prior to the execution of this Agreement (the "*SMB Disclosure Schedule*") (with specific reference to the particular Section or subsection of this Agreement to which the information set forth in such disclosure schedule relates; provided, however, that any information set forth in one section of such disclosure schedule shall be deemed to apply to each other Section or subsection thereof to which its relevance is readily apparent on its face), Empagio and SMB, jointly and severally, represent and warrant to Parent and Merger Sub as follows:

(a)    Organization, Standing and Corporate Power. Each of Empagio, SMB and their respective Subsidiaries has been duly organized and is validly existing and in good standing under the laws of the jurisdiction of its incorporation. Each of Empagio, SMB and their respective Subsidiaries has all requisite power and authority and possesses all governmental licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold and operate its properties and other assets and to carry on its business as currently conducted, except where the failure to have such government licenses, permits, authorizations or approvals individually or in the aggregate has not had and would not reasonably be expected to have an SMB Material Adverse Effect. Each of Empagio, SMB and their respective Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary, other than in such jurisdictions where the failure to be so qualified or licensed individually or in the aggregate has not had and would not reasonably be expected to have an SMB Material Adverse Effect. Empagio has made available to Parent complete and accurate copies of its Certificate of Formation and Operating Agreement, SMB's Certificate of Incorporation and By-laws, and the comparable organizational documents of each of their respective Subsidiaries, in each case as amended to the date hereof.

(b)    Subsidiaries. Section 3.02(b) of the SMB Disclosure Schedule lists each of the Subsidiaries of Empagio and SMB and, for each such Subsidiary, the jurisdiction of its

incorporation and a list of its directors and officers. All the issued and outstanding shares of capital stock of each such Subsidiary have been validly issued and are fully paid and nonassessable and are owned directly by SMB free and clear of all Liens and free of any restriction on the right to vote, sell or otherwise dispose of such capital stock or other equity interests. Except for the capital stock of its Subsidiaries, Empagio and SMB do not own, directly or indirectly, any capital stock of, or other voting securities or equity interests in, any corporation, partnership, joint venture, association or other entity.

    (c)    Capital Structure of Empagio.

        (i)    As of the date hereof, (i) 5,482,500 Common Membership Units of Empagio (the "*Empagio Common Units*") were issued and outstanding and (ii) 1,000 Series A Preferred Membership Units (the "*Empagio Preferred Units*") were issued and outstanding. As of the date hereof, no shares of Empagio Common Units or Empagio Preferred Units were reserved for issuance, except for an aggregate of 2,267,378 Empagio Common Units reserved for issuance upon the exercise of Empagio Unit Options, 6,454,082 Empagio Common Units reserved for issuance upon the exercise of Empagio Warrants and 191,201 Empagio Common Units reserved for issuance upon the conversion of convertible notes. Section 3.02(c) of the SMB Disclosure Schedule sets forth a true and correct capitalization table of Empagio as of the date hereof. Except as otherwise specified in this Section 3.02(c), none of Empagio, SMB or any of its Subsidiaries has or is bound by any outstanding subscriptions, options, warrants, calls, convertible securities, convertible notes, convertible debentures, preemptive rights, redemption rights, unit appreciation rights, equity-based performance units or other similar rights, agreements or commitments of any character relating to the purchase or issuance of any capital stock of or equity interests in Empagio, SMB or of any of its Subsidiaries or any securities representing the right to purchase or otherwise receive any capital stock or equity in Empagio, SMB or any of its Subsidiaries (including any rights plan or agreement) or equity-based awards, nor is there any other agreement to which Empagio, SMB or any of its Subsidiaries is a party obligating Empagio, SMB or any of its Subsidiaries to (A) issue, transfer or sell any capital stock or equity interests of Empagio, SMB or any of its Subsidiaries or securities convertible into or exchangeable or exercisable for such capital stock or equity interests, (B) issue, grant, extend or enter into any such subscription, option, warrant, call, convertible securities, equity-based performance units or other similar right, agreement, arrangement or commitment, (C) redeem or otherwise acquire any such capital stock or other equity interests or (D) provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, Empagio, SMB or any of its Subsidiaries. Section 3.02(c) of the SMB Disclosure Schedule contains a list setting forth, as of the date of this Agreement, all outstanding Empagio Unit Options, Empagio Warrants, SMB Stock Options, SMB Warrants and all other equity or equity-based awards relating to Empagio Common Units, Empagio Preferred Units, SMB Common Stock or any capital stock of any Subsidiary, the names of the optionees or grantees thereof, the date each such Empagio Unit Option, Empagio Warrant, SMB Stock Option, SMB Warrant or other award  was granted, the number of units or other equity subject to each such Empagio Unit Option, Empagio Warrant, SMB Stock Option, SMB Warrant or underlying each such other award, the expiration date of same, any vesting schedule with respect thereto which is not yet fully vested and the date on which each other award is scheduled to be settled or become free of restrictions, and the price at which same may be exercised. All outstanding units or shares are, and all units or shares which may be issued pursuant to the

Empagio Unit Options, Empagio Warrants, SMB Stock Options or SMB Warrants will be, when issued in accordance with the terms thereof, duly authorized and validly issued and not subject to preemptive rights. There are no bonds, debentures, notes or other indebtedness of Empagio, SMB or any of their respective Subsidiaries having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which members of Empagio or SMB may vote. None of Empagio, SMB or any of their Subsidiaries is a party to any voting agreement with respect to the voting of any such securities. No Person has any right to acquire any shares issuable in connection with the Merger.

(ii)     There are no member or stockholder agreements, voting trusts, proxies or other similar agreements, arrangements or understandings to which Empagio, SMB or any of their Subsidiaries is a party, or by which it or they are bound, obligating Empagio, SMB or their Subsidiaries with respect to any membership interests or capital stock of Empagio, SMB or any of their Subsidiaries. There are no rights or obligations, contingent or otherwise (including rights of first refusal in favor of Empagio, SMB or any of their Subsidiaries), of Empagio, SMB or any of their Subsidiaries, to repurchase, redeem or otherwise acquire any membership interests or shares of capital stock of Empagio, SMB or any of their Subsidiaries, as the case may be, or to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in SMB or any Subsidiary or any other entity. There are no registration rights or other agreements, arrangements or understandings to which Empagio, SMB or any of their Subsidiaries is a party, or by which it or they are bound, obligating Empagio, SMB or any of their Subsidiaries with respect to any Empagio Common Units or Empagio Preferred Units or shares of capital stock of SMB or any Subsidiary.

(d)     Capital Structure of SMB. The authorized shares of capital stock of SMB consist of 2,000 shares of common stock, no par value per share, 100 of which have been duly authorized and are validly issued and outstanding, fully paid and non-assessable. No shares of preferred stock have been authorized. All the issued and outstanding common stock of SMB is owned by Empagio and at the Effective Time will be owned by Empagio or its former members if Empagio is dissolved prior to such time, and there are (i) no other shares of capital stock or voting securities of SMB, (ii) no securities of SMB convertible into or exchangeable for shares of capital stock or voting securities of SMB and (iii) no options or other rights to acquire from SMB, and no obligations of SMB to issue, any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of SMB.

(e)     Authority; Noncontravention. Empagio and SMB have all requisite limited liability company or corporate, as the case may be, power and authority to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement. The execution and delivery of this Agreement by Empagio and SMB and the consummation by Empagio and SMB of the transactions contemplated by this Agreement have been duly authorized by all necessary corporate action on the part of Empagio and SMB and no other corporate proceedings on the part of Empagio or SMB are necessary to authorize this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Empagio and SMB and, assuming the due authorization, execution and delivery by Parent and Merger Sub, constitutes a legal, valid and binding obligation of Empagio and SMB, enforceable against Empagio and SMB in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of

creditors generally and to general principles of equity. The execution and delivery of this Agreement do not, and the consummation of the Merger and the other transactions contemplated by this Agreement and compliance by Empagio, SMB and their respective Subsidiaries with the provisions of this Agreement will not, conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, or result in the creation of any Lien in or upon any of the properties or other assets of Empagio, SMB and their respective Subsidiaries under, (x) their respective Certificate of Formation, Operating Agreement, Certificates of Incorporation or By-laws or the comparable organizational documents of any of their respective Subsidiaries, (y) any loan or credit agreement, bond, debenture, note, mortgage, indenture, lease, sublease, or other contract, agreement or obligation, to which the Empagio, SMB and their respective Subsidiaries is a party or any of their respective properties or other assets is subject or (z) governmental filings and other matters referred to in Section 3.02(f), any (A) Law applicable to Empagio, SMB and their respective Subsidiaries or their respective properties or other assets or (B) order, writ, injunction, decree, judgment or stipulation, in each case applicable to Empagio, SMB and their respective Subsidiaries or their respective properties or other assets, other than, in the case of clauses (y) and (z), any such conflicts, violations, breaches, defaults, rights, losses or Liens that individually or in the aggregate have not had and would not reasonably be expected to have an SMB Material Adverse Effect.

        (f)    Consents and Approvals. No consent, approval, order or authorization of, action by or in respect of, or registration, declaration or filing with, any Governmental Entity or Person is required by or with respect to Empagio, SMB or any of their Subsidiaries in connection with the execution and delivery of this Agreement by them or the consummation of the Merger or the other transactions contemplated by this Agreement, except for (i) the consents and approvals set forth in Section 3.02(f) of the SMB Disclosure Schedule; (ii) the filing of a premerger notification and report form by Empagio under the HSR Act and the receipt, termination or expiration, as applicable, of approvals or waiting periods required under the HSR Act or any other applicable foreign competition, merger control, antitrust or similar law or regulation; (iii) the filing of a Certificate of Merger with the Secretary of State of the State of Delaware and appropriate documents with the relevant authorities of other states in which SMB or any of its Subsidiaries is qualified to do business; and (iv) such other consents, approvals, orders, authorizations, actions, registrations, declarations and filings, the failure of which to be obtained or made individually or in the aggregate has not had and would not reasonably be expected to have an SMB Material Adverse Effect.

        (g)    Information Supplied. None of the information supplied or to be supplied by or on behalf of Empagio or SMB for inclusion in the Proxy Statement will, on the date it is first mailed to the stockholders of Parent or at the time of the Stockholders' Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

        (h)    Absence of Certain Changes or Events. Since the date of Empagio's formation, there has not been any SMB Material Adverse Change, and each of Empagio, SMB and their respective Subsidiaries has conducted its businesses only in the ordinary course.

(i)    <u>Litigation</u>. Except as disclosed in Section 3.02(i) of the SMB Disclosure Schedule, there is no suit, action or proceeding pending or, to the Knowledge of SMB, threatened against Empagio, SMB or any of their respective Subsidiaries or any of their respective assets, nor is there any judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator outstanding against, or, to the Knowledge of SMB, investigation by any Governmental Entity involving, Empagio, SMB or any of their respective Subsidiaries or any of their respective assets, nor is there any inquiry or internal investigation being conducted by Empagio, SMB or any of their respective Subsidiaries, the results of which would reasonably be expected to have an SMB Material Adverse Effect.

(j)    <u>Contracts</u>.

(i)    Section 3.02(j) of the SMB Disclosure Schedule sets forth a list of all SMB Material Contracts to which Empagio, SMB or any of their respective Subsidiaries is a party.  For purposes of this Section 3.02(j)(i), *"SMB Material Contract"* means:

(A)    any employment Contract with any officer of Empagio, SMB or any of their respective Subsidiaries, and  any severance, consulting, personal services, non-competition or indemnification Contracts;

(B)    licensing, merchandising or distribution Contracts;

(C)    Contracts granting a right of first refusal or first negotiation;

(D)    any Contract relating to indebtedness for borrowed money (including any obligation to guarantee the indebtedness for borrowed money of any Person other than SMB or any Subsidiary) having an outstanding principal amount in excess of $1,000,000, and, for each such Contract, the aggregate principal amount outstanding as of the date of this Agreement;

(E)    any Contract relating to a security interest imposed on any asset or property of Empagio, SMB or any of their Subsidiaries, other than Permitted Liens;

(F)    any Contract with any supplier or for the furnishing of services to Empagio, SMB or any of their Subsidiaries involving consideration of more than $100,000 over its remaining term (including any automatic extensions thereto);

(G)    any partnership, joint venture or similar agreement or arrangement with a third party;

(H)    any Contract that limits or purports to limit the ability of Empagio, SMB or any of their Subsidiaries to compete with any person or in any geographic area or during any period of time;

(I)    any Contract between or among Empagio, SMB or any of their Subsidiaries, on the one hand, and any director, officer or Affiliate of Empagio or SMB or any person that beneficially owns 5% or more of the outstanding shares of Empagio Common

Stock (including, in each case, any "associates" or members of the "immediate family" (as such terms are defined in Rule 12b-2 and Rule 16a-1 of the Exchange Act, respectively) of any such person), on the other hand;

(J)    any arrangement for receipt or repayment of any grant, subsidy or financial assistance from any Governmental Entity;

(K)    any agreement pursuant to which Empagio or SMB has acquired the assets or stock of any other Person and any agreement pursuant to which any Person is entitled to deferred purchase price or an earnout in connection therewith;

(L)    any agreement pursuant to which any Person is entitled to receive any assets of Empagio or SMB;

(M)    any indemnification agreement to which Empagio or SMB is a party;

(N)    any effective power of attorney granted by Empagio, SMB or any of their Subsidiaries;

(O)    any Contract that if terminated or subject to a default by any party thereto would reasonably be expected to have an SMB Material Adverse Effect;

(P)    any Contract that, as of February 1, 2008, resulted in annualized gross revenues to Empagio, SMB or any of their respective Subsidiaries of at least $500,000;

(Q)    any Contract that, as of February 1, 2008, has a maximum possible annualized liability or obligation on the part of Empagio, SMB or any of their respective Subsidiaries of at least $250,000; and

(R)    any Contract for development services related to Intellectual Property Rights of Empagio, SMB or any Subsidiary, whether by an employee or independent contractor;

(S)    any Contract that imposes any material restriction on the right or ability of Empagio, SMB or a Subsidiary: (1) to compete with, or solicit any customer of, any other Person; (2) to acquire any product or other asset or any services from any other Person; (3) to solicit, hire or retain any Person as an employee, consultant or independent contractor; (4) to develop, sell, supply, distribute, offer, support or service any product or any technology or other asset to or for any other Person; (5) to perform services for any other Person; or (6) to transact business with any other Person;

(T)    any Contract that requires SMB or any Subsidiary to give favored pricing to any customers or potential customers;

(U)    any Contract involving the lease of real property;

(V)     any employment, severance, consulting, personal services, non-competition or indemnification Contracts with any officer of SMB or a Subsidiary;

(W)     any Contract that is material to the operation of Empagio's, SMB's or any of their Subsidiaries' business that contains a change of control provision that would be triggered by the consummation of the transactions contemplated by this Agreement; and

(X)     any Contract that would be required to be filed as a "material agreement" pursuant to Item 6.01(A)(10) of Regulation S-K under the Securities Act or disclosed on a Current Report on Form 8-K.

(ii)     Each SMB Material Contract is a valid and binding obligation of Empagio, SMB or its Subsidiary, as the case may be, and, to the Knowledge of SMB, a valid and binding obligation of each other party thereto. None of Empagio, SMB or any of their respective Subsidiaries or, to the Knowledge of SMB, any other party is in breach of, or in default under, or has repudiated, and no event has occurred which, with notice or lapse of time or both, would constitute a breach of, or a default under, any such SMB Material Contract, except for such breach, default or repudiation that has not had and would not reasonably be expected to have, individually or in the aggregate, an SMB Material Adverse Effect. Empagio and/or SMB have made available to Parent a true and correct copy of each SMB Material Contract. None of Empagio, SMB or any of their respective Subsidiaries is a party to any material oral Contract.

(k)     Customers.  Section 3.02(k) of the SMB Disclosure Schedule sets forth a true and complete list of the top 20 revenue producing customers of Empagio, SMB or any of their Subsidiaries for the year ended December 31, 2007 (each, an "*SMB Major Customer*") Neither Empagio nor SMB has received written notice from any SMB Major Customer stating that it has terminated or intends to terminate its relationship with Empagio, SMB or any Subsidiary. To the Knowledge of SMB, none of Empagio, SMB or any of their respective Subsidiaries is in breach or default under any Contract with any SMB Major Customer, except where any such breach or default has not had or would not reasonably be expected to have an SMB Material Adverse Effect.

(l)     Compliance with Law.

(i)     The businesses of Empagio, SMB and their respective Subsidiaries have been conducted in accordance with applicable Laws except where such noncompliance has not had or would reasonably not be expected to result in an SMB Material Adverse Change. Since January 1, 2005, none of Empagio, SMB or their respective Subsidiaries has received notice of any violation (or any investigation with respect thereto) of any such Laws, and none of Empagio, SMB or their respective Subsidiaries is in default with respect to any order, writ, judgment, award, injunction or decree of any Governmental Entity, applicable to any of its assets, properties or operations except where such failure has not had or would reasonably not be expected to result in an SMB Material Adverse Change.

(ii)     None of Empagio, SMB or any of their respective Subsidiaries has made, arranged or modified (in any material way) any extension of credit in the form of a

personal loan to any executive officer or director of Empagio, SMB or any of their respective Subsidiaries.

    (m)    <u>Environmental Matters.</u>

        (i)    Each of Empagio, SMB and their respective Subsidiaries is, and has been, in compliance with all Environmental Laws except where the failure to be in compliance would not have an Empagio Material Adverse Effect. Each of Empagio, SMB and their respective Subsidiaries has in effect all licenses, permits and other authorizations required under all Environmental Laws and all such licenses, permits and other authorizations are in full force and effect except where the failure to have any such license, permit or authorization would not have an Empagio Material Adverse Effect.  Each of Empagio, SMB and their respective Subsidiaries is in compliance with all such licenses, permits and authorizations except where the failure to be in compliance would not have an SMB Material Adverse Effect.

        (ii)    There is no material proceeding pending or, to the Knowledge of Empagio, threatened against Empagio, SMB and their respective Subsidiaries or any of their respective properties under any Environmental Law, and Empagio, SMB and their respective Subsidiaries have not received any notice of material violation or potential liability under any Environmental Laws from any Person or any Governmental Entity inquiry, request for information, or demand letter under any Environmental Law relating to operations or properties of Empagio, SMB and their respective Subsidiaries. None of Empagio, SMB and their respective Subsidiaries or respective properties or operations is subject to any orders arising under Environmental Laws. None of Empagio, SMB and their respective Subsidiaries has entered into any agreement pursuant to which any of them has assumed or will assume any material liability under Environmental Laws, including without limitation, any obligation for costs of remediation, of any other Person

        (iii)    To the Knowledge of SMB, there has been no release or threatened release of any Hazardous Material, on, at or beneath any of the SMB Leased Real Property or other properties currently or previously owned or operated by Empagio, SMB and their respective Subsidiaries or any surface waters or groundwaters thereon or thereunder which requires any material disclosure, investigation, cleanup, remediation, monitoring, abatement, deed or use restriction by any of them, or which would be expected to give rise to any actual or alleged material liability for personal injury, property damage, natural resources damage or other material liability or damages to Empagio, SMB and their respective Subsidiaries under any Environmental Laws.

        (iv)    None of Empagio, SMB and their respective Subsidiaries has sent or arranged for the disposal of any Hazardous Material, or transported any Hazardous Material, that reasonably would be expected to give rise to any material liability for any damages or costs of investigation, remediation or any other action to respond to the release or threatened release of any Hazardous Material.

        (v)    Empagio and/or SMB has made available to Parent copies of all environmental studies, investigations, reports or assessments concerning Empagio, SMB and

their respective Subsidiaries, the SMB Leased Real Property and any owned real property currently or previously owned or operated by Empagio, SMB and their respective Subsidiaries.

    (n)    <u>Absence of Changes in Company Benefit Plans; Labor Relations</u>.

    (i)    Since January 1, 2005 to the date of this Agreement, there has not been any adoption, material amendment or termination by Empagio, SMB or any of their respective Subsidiaries or any ERISA Affiliate of any employment, bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock appreciation, restricted stock, stock option, phantom stock, performance, retirement, thrift, savings, stock bonus, paid time off, perquisite, fringe benefit, vacation, severance, disability, death benefit, hospitalization, medical, welfare benefit or other plan, program, policy, arrangement, agreement or understanding (whether or not legally binding) maintained, contributed to or required to be maintained or contributed to by Empagio, SMB or any of their respective Subsidiaries or any other person or entity that, together with Empagio, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code (each, an "*ERISA Affiliate*"), in each case providing benefits to any current or former director, officer, employee, independent contractor or consultant of Empagio, SMB, any of their respective Subsidiaries or any ERISA Affiliate, but not including SMB Benefit Agreements (all such plans, programs, policies, arrangements, agreements and understandings, including any such plan, program, policy, arrangement, agreement or understanding entered into or adopted on or after the date of this Agreement, collectively, the "*SMB Benefit Plans*"), or any change in any actuarial or other assumption used to calculate funding obligations with respect to any SMB Pension Plan, or any change in the manner in which contributions to any SMB Pension Plan are made or the basis on which such contributions are determined, other than amendments or other changes as required to ensure that such SMB Pension Plan is not then out of compliance with applicable law, or reasonably determined by SMB to be necessary or appropriate to preserve the qualified status of an SMB Pension Plan under Section 401(a) of the Code.

    (ii)    None of Empagio, SMB or any of their respective Subsidiaries is a party to any collective bargaining agreement or other labor union contract or similar scheme or arrangement applicable to its employees nor does SMB have Knowledge of any activities or proceedings of any labor union to organize any such employees.

    (iii)    Each of Empagio, SMB and their respective Subsidiaries is in compliance in all material respects with all applicable Laws relating to employment and employment practices, the classification of employees, wages, hours, collective bargaining, unlawful discrimination, civil rights, safety and health, workers' compensation and terms and conditions of employment except where such failure has not had or would reasonably not be likely to have an SMB Material Adverse Effect. There are no charges with respect to or relating to Empagio, SMB or any of their respective Subsidiaries pending or, to the Knowledge of SMB, threatened before the Equal Employment Opportunity Commission or any state, local or foreign agency responsible for the prevention of unlawful employment practices. Since January 1, 2006, none of Empagio, SMB or any of their respective Subsidiaries has received any notice from any national, state, local or foreign agency responsible for the enforcement of labor or employment Laws of an intention to conduct an investigation of any of Empagio, SMB or any of their respective Subsidiaries and no such investigation is in progress.

(iv)    There has been no "mass layoff" or "plant closing" as defined by WARN with respect to the current or former employees of Empagio, SMB or any of their respective Subsidiaries.

(o)    ERISA Compliance.

(i)    Section 3.02(o)(i) of the SMB Disclosure Schedule contains a complete and accurate list of each material SMB Benefit Plan that is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) (sometimes referred to herein as an "*SMB Pension Plan*"), each material SMB Benefit Plan that is an "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) and all other material SMB Benefit Plans and material SMB Benefit Agreements in effect as of the date of this Agreement. Empagio and/or SMB has made available to Parent complete and accurate copies of (A) each such SMB Benefit Plan and SMB Benefit Agreement, (B) the two most recent annual reports on Form 5500 filed with the IRS with respect to each SMB Benefit Plan (if any such report was required under applicable law), (C) the most recent summary plan description for each SMB Benefit Plan for which a summary plan description is required under applicable law and (D) each trust agreement and insurance or group annuity contract relating to any SMB Benefit Plan. Each SMB Benefit Plan has been administered in accordance with its terms and with the applicable provisions of ERISA, the Code and all other applicable laws and the terms of all applicable collective bargaining agreements, except where such non-compliance has not had and would not reasonably be expected to result in an SMB Material Adverse Effect.

(ii)    All SMB Pension Plans intended to be tax qualified have received favorable determination letters from the IRS with respect to all tax law changes with respect to which the IRS is currently willing to provide a determination letter, to the effect that such SMB Pension Plans are qualified and exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, no such determination letter has been revoked (nor, to the Knowledge of SMB, has revocation been threatened) and, to the Knowledge of SMB, no event has occurred since the date of the most recent determination letter or application therefor relating to any such SMB Pension Plan that has had or would reasonably be expected to result in a material liability to SMB. Empagio and/or SMB has delivered or made available to Parent a complete and accurate copy of the most recent determination letter received prior to the date hereof with respect to each SMB Pension Plan

(iii)    Neither Empagio nor, within the last six years, any ERISA Affiliate, (A) has maintained, contributed to or been required to contribute to, or has any actual or contingent liability under, any SMB Benefit Plan that is subject to Title IV of ERISA or Section 412 of the Code or that is otherwise a defined benefit pension plan and (B) has any unsatisfied liability under Title IV of ERISA or Section 412 of the Code which would reasonably be expected to result in an SMB Material Adverse Effect.

(iv)    All reports, returns and similar documents with respect to all SMB Benefit Plans required to be filed with any Governmental Entity or distributed to any SMB Benefit Plan participant have been duly and timely filed or distributed, except where such failure has not had and would not reasonably be expected to result in a material liability to SMB. None of Empagio, SMB, any of their respective Subsidiaries or any ERISA Affiliate has received

notice of, and to the Knowledge of SMB, there are no investigations by any Governmental Entity with respect to, termination proceedings or other claims (except claims for benefits payable in the normal operation of the SMB Benefit Plans), suits or proceedings against or involving any SMB Benefit Plan or SMB Benefit Agreement or asserting any rights or claims to benefits under any SMB Benefit Plan or SMB Benefit Agreement that would reasonably be expected to give rise to any material liability, and, to the Knowledge of SMB, there are not any facts that would reasonably be expected to give rise to any SMB Material Adverse Effect in the event of any such investigation, claim, suit or proceeding.

(v)     Except where such failure has not had and would not reasonably be expected to result in a material liability to SMB, all contributions, premiums and benefit payments under or in connection with the SMB Benefit Plans that are required to have been made as of the date hereof in accordance with the terms of the SMB Benefit Plans have been timely made. No SMB Pension Plan has an "accumulated funding deficiency" (as such term is defined in Section 302 of ERISA or Section 412 of the Code), whether or not waived.

(vi)     With respect to each SMB Benefit Plan, (A) to the Knowledge of the SMB, there has not occurred any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) that would reasonably be expected to result in a material liability to SMB and (B) to the Knowledge of SMB, none of Empagio, SMB or any of their respective Subsidiaries or any of their respective officers, directors or employees has engaged in any transaction or acted in a manner, or failed to act in a manner, that would reasonably be expected to subject SMB to any liability for breach of fiduciary duty under ERISA that would reasonably be expected to result in a material liability to SMB. There has not been any "reportable event" (as that term is defined in Section 4043 of ERISA) for which the 30-day reporting requirement has not been waived with respect to any Empagio Benefit Plan during the last five years.

(vii)     To the Knowledge of SMB, each of Empagio, SMB or any of their respective Subsidiaries complies in all material respects with the applicable requirements of Section 4980B(f) of the Code or any similar state or local law with respect to each SMB Benefit Plan that is a group health plan, as such term is defined in Section 5000(b)(1) of the Code or such state or local law. Except as required by Section 4980B(f) of the Code, no SMB Benefit Plan or SMB Benefit Agreement that is an employee welfare benefit plan or that provides welfare benefits provides benefits after termination of employment.

(viii)     Except as contemplated by this Agreement, no participant will be entitled to any additional compensation, severance or other benefits or any acceleration of the time of payment or vesting of any compensation, severance or other benefits as a result of the Merger or any other transaction contemplated by this Agreement (alone or in combination with any other event) or any benefits the value of which will be calculated on the basis of the Merger or any other transaction contemplated by this Agreement (alone or in combination with any other event). None of the execution and delivery of this Agreement, the obtaining of member or shareholder approval or the consummation of the Merger or any other transaction expressly contemplated by this Agreement will (including as a result of any termination of employment on or following the Effective Time) (A) entitle any participant to severance, termination, change in control or similar pay or benefits, (B) accelerate the time of payment or vesting, or trigger any

payment or funding (through a grantor trust or otherwise) of, compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, or increase the cost of, any SMB Benefit Plan or SMB Benefit Agreement or (C) result in any breach or violation of, or a default under, any SMB Benefit Plan or SMB Benefit Agreement.

       (ix)    No deduction by Empagio, SMB or any of their respective Subsidiaries in respect of any "applicable employee remuneration" (within the meaning of Section 162(m) of the Code) has been disallowed or is subject to disallowance by reason of Section 162(m) of the Code, except where such disallowance has not had and would not reasonably be expected to result in an SMB Material Adverse Effect.

       (x)    Each SMB Benefit Agreement is, in form and operation, in good faith compliance with Section 409A of the Code.

       (p)    <u>No Excess Parachute Payments</u>.  Other than payments that may be made to persons set forth in Section 3.02(p) of the SMB Disclosure Schedule (the "*Primary SMB Executives*"), (i) no amount or other entitlement or economic benefit that would be received (whether in cash or property or the vesting of property) as a result of the execution and delivery of this Agreement, the obtaining of member or shareholder approval, the consummation of the Merger or any other transaction contemplated by this Agreement (including as a result of termination of employment on or following the Effective Time) by or for the benefit of any participant who is a "disqualified individual" (as such term is defined in Treasury Regulation Section 1.280G-1) under any SMB Benefit Plan, SMB Benefit Agreement or other compensation arrangement would be characterized as an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code), and (ii) no such disqualified individual is entitled to receive any additional payment (e.g., any tax gross up or other payment) from SMB or the Surviving Corporation or any other person in the event that the excise tax required by Section 4999(a) of the Code is imposed on such disqualified individual.

       (q)    <u>Taxes</u>.

       (i)    Each of Empagio, SMB and their respective Subsidiaries has filed or has caused to be filed in a timely manner (within any applicable extension period) all material tax returns required to be filed.  All such tax returns are complete and accurate in all material respects and have been prepared in compliance in all material respects with all applicable laws and regulations.  Each of Empagio, SMB and their respective Subsidiaries has timely paid or caused to be paid (or Empagio has paid on its behalf) all taxes due and owing.

       (ii)    To the Knowledge of SMB, no tax return of Empagio, SMB or any of their respective Subsidiaries is or has been within the last five years under audit or examination by any taxing authority, and no written notice has been received by Empagio, SMB or any of their respective Subsidiaries that any audit, examination or similar proceeding is pending, proposed or asserted with regard to any taxes or tax returns of Empagio, SMB or any of their respective Subsidiaries.  There is no deficiency, refund litigation, proposed adjustment or matter in controversy with respect to any material amount of taxes due and owing by Empagio, SMB or any of their respective Subsidiaries.  Each deficiency resulting from any completed audit or examination relating to taxes by any taxing authority has been timely paid or is being

contested in good faith and has been reserved for on the books of Empagio and/or SMB. The general statute of limitations with respect to federal income taxes as set forth in Section 6501 of the Code is closed with respect to the tax returns of Empagio, SMB or their respective Subsidiaries for all years through 2003. There is no currently effective agreement or other document extending, or having the effect of extending, the period of assessment or collection of any taxes of Empagio, SMB and any of their respective Subsidiaries nor has any written request been made for any such extension, and no currently effective power of attorney (other than powers of attorney authorizing employees of Empagio, SMB or any of their respective Subsidiaries to act on behalf of Empagio, SMB or any of their respective Subsidiaries) with respect to any taxes has been executed or filed with any taxing authority.

(iii)    None of Empagio, SMB or any of their respective Subsidiaries will be required to include in a taxable period ending after the Effective Time a material amount of taxable income attributable to income that accrued in a prior taxable period (or portion of a taxable period) but was not recognized for tax purposes in any prior taxable period as a result of (A) an open transaction disposition made on or before the Effective Time, (B) a prepaid amount received on or prior to the Effective Time, (C) the installment method of accounting, (D) the completed contract method of accounting, (E) the long-term contract method of accounting, (F) the cash method of accounting or Section 481 of the Code or (G) any comparable provisions of state or local tax law, domestic or foreign, or for any other reason, other than any amounts that are specifically reflected in a reserve for taxes on the financial statements of Empagio, SMB and their respective Subsidiaries.

(iv)    Empagio, SMB and their respective Subsidiaries have complied in all material respects with all applicable statutes, laws, ordinances, rules and regulations relating to the payment and withholding of any material amount of taxes (including the withholding of taxes pursuant to Sections 1441, 1442, 3121 and 3402 of the Code and similar provisions under any federal, state, local or foreign tax laws) and have, within the time and the manner prescribed by law, withheld from and paid over to the proper governmental authorities all material amounts required to be so withheld and paid over under applicable laws.

(v)    None of Empagio, SMB or any of their respective Subsidiaries has within the last two years constituted either a "distributing corporation" or a "controlled corporation" as such terms are defined in Section 355 of the Code in a distribution of stock qualifying or intended to qualify for tax-free treatment (in whole or in part) under Section 355(a) or 361 of the Code.

(vi)    None of Empagio, SMB or any of their respective Subsidiaries joins or has joined, for any taxable period in the filing of any affiliated, aggregate, consolidated, combined or unitary tax return other than consolidated tax returns for the consolidated group of which Empagio or SMB is the common parent.

(vii)    None of Empagio, SMB or any of their respective Subsidiaries has ever entered into a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2).

(viii)    No written claim has ever been made by any authority in a jurisdiction where any of Empagio, SMB and their respective Subsidiaries do not file a tax return that it is, or may be, subject to a material amount of tax by that jurisdiction.

(ix)    Other than with respect to the consolidated group of corporations of which SMB is the common parent, none of Empagio, SMB or any of their respective Subsidiaries is a party to or bound by any tax sharing agreement, tax indemnity obligation or similar agreement, arrangement or practice with respect to taxes (including any advance pricing agreement, closing agreement or other agreement relating to taxes with any taxing authority).

(x)    No taxing authority has asserted in writing any material liens for taxes with respect to any assets or properties of Empagio, SMB or any of their respective Subsidiaries that have not otherwise been paid or satisfied, except for statutory liens for taxes not yet due and payable.

(xi)    None of Empagio, SMB or any of their respective Subsidiaries has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(xii)    None of Empagio, SMB or any of their respective Subsidiaries (A) is, to the Knowledge of SMB, a "passive foreign investment company" within the meaning of Section 1297(a) of the Code and the Treasury Regulations promulgated thereunder or (B) has ever made an election under Section 1362 of the Code to be treated as an S corporation for federal income tax purposes or made a similar election under any comparable provision of any tax law.

(xiii)    None of Empagio, SMB or any of their respective Subsidiaries has taken any action or knows of any fact, agreement, plan or circumstance that is reasonably likely to prevent the Merger from qualifying as a "reorganization" within the meaning of Section 368(a) of the Code.

(xiv)    As used in this Agreement (A) "tax" or "taxes" shall include (whether disputed or not) all (x) federal, state, local and foreign income, property, sales, use, excise, withholding, payroll, employment, social security, value-added, ad valorem, capital gain, alternative minimum, transfer, franchise, capital stock, net worth and other taxes, including taxes based on or measured by gross receipts, profits, sales, use or occupation, tariffs, levies, impositions, assessments, duties and similar governmental charges or fees of any kind whatsoever, including any interest, penalties and additions with respect thereto, (y) liability for the payment of any amounts of the type described in clause (x) as a result of being or having been a member of an affiliated, consolidated, combined, unitary or aggregate group and (z) liability for the payment of any amounts as a result of being or having been party to any tax sharing agreement or as a result of any express or implied obligation to indemnify any other person with respect to the payment of any amounts of the type described in clause (x) or (y); (B) "taxing authority" means any federal, state, local or foreign government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising tax regulatory authority; and (C) "tax return" or "tax returns" means all returns, declarations of estimated tax payments, claims for refund, disclosure statements (including any statement

pursuant to Treasury Regulation Section 1.6011-4(a)), forms, reports, estimates, information returns and statements, including any related or supporting information with respect to any of foregoing, filed or to be filed with any taxing authority in connection with the determination, assessment, collection or administration of any taxes.

(r)     Real Property.

(i)     None of Empagio, SMB or any of their respective Subsidiaries owns any real property.

(ii)     Section 3.02(r) of the SMB Disclosure Schedule sets forth a complete and accurate list of all material real property leased by SMB and its Subsidiaries (the "*SMB Leased Real Property*"). Except as has not had and would not reasonably be expected to have, individually or in the aggregate, an SMB Material Adverse Effect, (A) all leases (including subleases) of real property under which SMB and its Subsidiaries is a lessee or sublessee (the "*SMB Leases*") are in full force and effect and (B) none of SMB or its Subsidiaries, nor, to the Knowledge of SMB, any other party to any such SMB Lease, is in default under any of the SMB Leases, and no event has occurred which, with notice or lapse of time or both, would constitute a default by SMB or any of its Subsidiaries under any of the SMB Leases. The transactions contemplated by this Agreement do not require the consent of any other party to an SMB Lease. None of SMB or any of its Subsidiaries has subleased, licensed or otherwise granted anyone the right to use or occupy any SMB Leased Real Property or any portion thereof, and none of SMB or any of its Subsidiaries has collaterally assigned or granted any other security interest in any such leasehold estate or any interest therein.

(s)     Intellectual Property.

(i)     SMB and its Subsidiaries own all right, title and interest to, or are validly licensed or otherwise have the right to use, all Intellectual Property Rights used in the business of Empagio, SMB and any of their respective Subsidiaries, except for such Intellectual Property Rights the failure of which to own, license or otherwise have the right to use, individually or in the aggregate, has not had and would not reasonably be expected to have an SMB Material Adverse Effect. Section 3.02(s) of the SMB Disclosure Schedule sets forth, as of the date hereof, a complete and accurate list of: (A) all patents and applications therefor, registered trademarks and applications therefor, service marks and other designations of origin, domain name registrations (if any) and copyright registrations (if any) owned by SMB or its Subsidiaries (collectively, the "*SMB Registered IP*") and (B) all options, rights, licenses or interests of any kind relating to Intellectual Property Rights that are material to Empagio, SMB and/or their respective Subsidiaries granted (1) to SMB and its Subsidiaries (other than software licenses for generally available software), and (2) by SMB and its Subsidiaries to any other person.

(ii)     None of Empagio, SMB or any of their respective Subsidiaries has infringed upon any Intellectual Property Rights of any other person. No claims are pending or, to the Knowledge of SMB, threatened, nor are there any outstanding judgments, injunctions, orders or decrees against Empagio, SMB or any of their respective Subsidiaries by any person with respect to the ownership, validity, enforceability, effectiveness, sale, manufacture or use in

the business of Empagio, SMB or any of its Subsidiaries of any Intellectual Property Rights. To the Knowledge of SMB, no other person has interfered with, infringed upon, misappropriated, diluted or otherwise come into conflict with any Intellectual Property Rights of Empagio, SMB or any of their respective Subsidiaries.

(iii)    Empagio, SMB and their respective Subsidiaries have used commercially reasonable efforts to maintain their trade secrets in confidence, including the requirement of certain employees of Empagio, SMB and their respective Subsidiaries to execute confidentiality agreements with respect to intellectual property developed for or obtained from Empagio, SMB and their respective Subsidiaries. Without limiting the generality of the foregoing:

(A)    all documents and instruments reasonably necessary in SMB's sole discretion to establish, secure and perfect the rights of the Empagio, SMB and their respective Subsidiaries in the SMB Registered IP have been validly executed, delivered and filed in a timely manner with the appropriate Governmental Entity, except where such failure would not reasonably be expected to have a SMB Material Adverse Effect;

(B)    each Person who is or was an employee of Empagio, SMB or any of their respective Subsidiaries and who is or was substantively and materially involved in the creation or development of any Intellectual Property Rights has signed or otherwise been subject to an irrevocable assignment of Intellectual Property Rights to Empagio, SMB or any their respective Subsidiaries for which such Person is or was an employee; and

(C)    no Contract limits or restricts the ability of Empagio, SMB or any of their respective Subsidiaries to use, exploit, assert or enforce any of its Intellectual Property Rights.

(iv)    No interference, opposition, reissue, reexamination or other legal proceeding of any nature is or has been pending or threatened in which the scope, validity or enforceability of any Intellectual Property Right of Empagio, SMB or any of their respective Subsidiaries are being, or have been contested or challenged except where such interference, opposition, reissue, reexamination or proceeding would not reasonably be expected to have a SMB Material Adverse Effect.

(v)    Neither the execution, delivery or performance of this Agreement, nor the consummation of any of the transactions contemplated hereby, will, with or without notice or the lapse of time or both, result in or give any other Person the right or option to cause or declare: (A) a loss of, or Encumbrance on, any Intellectual Property Right; (B) the release, disclosure or delivery of any source code by any Person; (C) the grant, assignment or transfer to any other Person of any license or other right or interest under, to or in any Intellectual Property Right; or (iv) a violation of any third party Intellectual Property Rights.

(vi)    Except to the extent there would not reasonably be expected to have a SMB Material Adverse Effect, with respect to third party software used in any product of Empagio, SMB or any of their respective Subsidiaries:

(A)    the license, sublicense, agreement or permission covering the software is legal, valid, binding, enforceable and in full force and effect;

(B)    the license, sublicense, agreement or permission will continue to be legal, valid, binding and enforceable, and in full force and effect following the consummation of the transactions contemplated in this Agreement; and

(C)    to the Knowledge of SMB, no party to the license, sublicense, agreement or permission is in breach or default, and no event has occurred that with notice or lapse of time or both would constitute a breach or default or permit termination, modification or acceleration thereunder.

(vii)    No Intellectual Property Rights of SMB contain any bug, defect or error that materially and adversely affects the use, functionality or performance of such Intellectual Property Rights.

(viii)    No Intellectual Property Rights of SMB currently contained in a product of Empagio, SMB or any of their respective Subsidiaries contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing, any of the following functions: (A) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (B) damaging or destroying any data or file without the user's consent.

(t)    Brokers and Finders.  Except as set forth in Section 3.02(t) of the SMB Disclosure Schedule, no broker, finder or similar intermediary has acted for or on behalf of, or is entitled to any broker's, finder's or similar fee or other commission from Empagio, SMB or any of their respective Subsidiaries or Affiliates in connection with this Agreement or any of transactions contemplated hereby.

(u)    Insurance.  Section 3.02(u) of the SMB Disclosure Schedule contains a complete and accurate list of all policies of fire, liability, workers' compensation, indemnity and other forms of insurance owned, held by or applicable to Empagio, SMB and their respective Subsidiaries and their assets, properties and operations and such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid or will be paid in accordance with the applicable terms, and no notice of cancellation or termination has been received with respect to any such policy. There are no pending or, to the Knowledge of SMB, threatened claims under any insurance policy.

(v)    Financial Statements.  Empagio and/or SMB has delivered or caused to be delivered to Parent a true and complete copy of consolidated Empagio's, SMB's and each of their Subsidiaries' unaudited financial statements for December 31, 2007, consisting of a balance sheet and the related statements of income, cash flows and changes in stockholders' or members' equity for the periods then ended (collectively, the "*Empagio Financial Statements*").  A true and complete copy of the Empagio Financial Statements is attached to Section 3.02(v) of the SMB Disclosure Schedule.  The Empagio Financial Statements are in accordance with the books

and records of such parties, all of which have been maintained in accordance with good business practice and in the normal and ordinary course of business, were prepared in accordance with GAAP applied on a consistent basis, and present fairly in all material respects the financial position of the relevant party as of the date thereof and the results of operations and cash flows for the periods covered thereby. Since the date of the Empagio Financial Statements, no indebtedness, liabilities or obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and whether due or to become due) have been incurred by Empagio, SMB or its Subsidiaries except for liabilities and obligations incurred in the ordinary course of business. Section 3.02(v) of the SMB Disclosure Schedule sets forth the revenues generated by each of Empagio, SMB and its Subsidiaries for the period from the date of their formation through December 31, 2007 and the EBITDA for each of Empagio, SMB and its Subsidiaries for such periods.

(w)     No Undisclosed Liabilities.  None of Empagio, SMB or any of their Subsidiaries has any undisclosed liabilities or obligations of any nature, accrued, contingent or otherwise, and whether or not required to be recorded or reflected on a balance sheet under GAAP, except for those that have arisen in the ordinary course of business consistent with past practice, and there is no existing condition, situation or set of circumstances that could reasonably be expected to result in such a liability or obligation except for liabilities or obligations which arose in the ordinary course of business.

(x)     No Default.  None of Empagio, SMB or any of their respective Subsidiaries is in violation in any material respect of any term of (i) its Certificate of Formation, Operating Agreement, Certificate of Incorporation, Bylaws or other organizational documents, (ii) any agreement or instrument related to indebtedness for borrowed money or any other agreement to which it is a party or by which it is bound, or (iii) any Law applicable to it or any of its properties or assets, except in the case of (ii) or (iii), for violations that have not had and would not be reasonably expected to have, individually or in the aggregate, an SMB Material Adverse Effect or, after Closing, a Parent Material Adverse Effect.

(y)     Investment Representations.  In the event that Empagio receives any Merger Consideration in connection with this Agreement and the transactions contemplated hereby, Empagio represents and warrants that: it is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act; it is acquiring Parent Common Stock for its own account, for investment purposes only, and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or any state securities law; it has no current arrangements or understandings for the resale or distribution to others and will only resell such Parent Common Stock or any part thereof pursuant to a registration or an available exemption under applicable Law; it acknowledges that the offer and sale of Parent Common Stock has not been registered under the Securities Act or the securities laws of any state or other jurisdiction, and that Parent Common Stock is being offered and sold pursuant to an exemption from registration contained in the Securities Act and state securities laws, that the exemption depends upon, among other things, the bona fide nature of its investment intent as expressed herein, that Parent Common Stock is "restricted securities" under applicable U.S. federal and state securities laws and must be held indefinitely and cannot be disposed of unless they are subsequently registered under the Securities Act and any applicable state laws or an exemption from such registration is available; it understands and

agrees that certificates representing the Parent Common Stock will bear a legend substantially similar to the legend set forth below in addition to any other legend that may be required by applicable Law, or by any agreement between it and Parent:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS. THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, OR (B) IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS.

(z)     No Additional Rights of Third Parties. Except as contemplated in Article II hereof, no Person is entitled to receive any equity interest in Empagio, SMB or any Subsidiary or any cash or other proceeds as a result of or in connection with the consummation of the Merger.

## ARTICLE IV.
## COVENANTS RELATING TO CONDUCT OF BUSINESS

SECTION 4.01     Conduct of Business.

(a)     Conduct of Business by Parent. During the period from the date of this Agreement to the Effective Time, except as otherwise set forth in Section 4.01(a) of Parent Disclosure Schedule or as consented to in writing (which consent shall not be unreasonably withheld or delayed) in advance by SMB or as otherwise expressly permitted or required under this Agreement, Parent shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course consistent with past practice and in compliance in all material respects with all applicable Laws except where any violation of applicable Laws would not have a Parent Material Adverse Effect and, to the extent consistent therewith, use commercially reasonable efforts to preserve substantially its relationships with customers, vendors and others having material business dealings with it. In addition to and without limiting the generality of the foregoing, during the period from the date of this Agreement to the Effective Time, except as otherwise set forth in Section 4.01(a) of Parent Disclosure Schedule or as otherwise expressly permitted or required under this Agreement, Parent and Merger Sub shall not, and shall not permit any of their Subsidiaries to, without SMB's prior written consent (which consent shall not be unreasonably withheld or delayed):

(i)     (A) declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property) in respect of, any of its capital stock, other than dividends or distributions by a direct or indirect wholly-owned Subsidiary of Parent to its stockholders, (B) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (C) purchase, redeem or otherwise acquire any shares of its capital stock or any other

securities thereof or any options, warrants, calls or rights to acquire any such shares or other securities, other than in connection with (1) the forfeiture of Parent Stock Options and restricted stock and (2) the withholding of shares of Parent Common Stock to satisfy tax obligations with respect to Parent Stock Options and restricted stock;

(ii)    issue, sell, grant, pledge or otherwise encumber or subject to any Lien any shares of its capital stock, any other voting securities or any securities convertible into, or any rights, warrants or options to acquire, any such shares, voting securities or convertible securities, or any "phantom" stock, "phantom" stock rights, stock appreciation rights or stock-based performance units, including pursuant to Contracts as in effect on the date hereof (other than (A) the issuance of shares of Parent Common Stock upon the exercise of Parent Stock Options or Parent Warrants, in each case outstanding on the date hereof in accordance with their terms on the date hereof and (B) as required under any Parent Benefit Agreement or Parent Benefit Plan in effect on the date hereof);

(iii)    amend Parent Articles or Parent By-laws or other comparable charter or organizational documents of any of Parent 's Subsidiaries, in each case except as may be required by Law or the rules and regulations of the SEC or the Nasdaq;

(iv)    directly or indirectly acquire (A) by merging or consolidating with, or by purchasing assets of, or by any other manner, any Person or division, business or equity interest of any Person or (B) any asset or assets that, individually, has a purchase price in excess of $250,000 or, in the aggregate, have a purchase price in excess of $500,000, except for new capital expenditures, which shall be subject to the limitations of clause (vii) below, and except for purchases of supplies, equipment or other items in the ordinary course of business consistent with past practice;

(v)    sell, lease, license, mortgage, sell and leaseback or otherwise encumber or subject to any Lien (other than Permitted Liens) or otherwise dispose of any of its material properties or other material assets or any interests therein, except for sales of used equipment in the ordinary course of business consistent with past practice;

(vi)    (A) incur any indebtedness for borrowed money in excess of $10,000,000 or guarantee any such indebtedness of another person, issue or sell any debt securities or calls, options, warrants or other rights to acquire any debt securities of Parent or any of its Subsidiaries or guarantee any debt securities of another person or (B) make any loans, advances or capital contributions to, or investments in, any other Person, other than to employees in respect of travel or other customary business expenses in the ordinary course of business consistent with past practice;

(vii)    make any new capital expenditure or expenditures which, individually, is in excess of $250,000 or, in the aggregate, are in excess of $500,000;

(viii)    enter into, modify, amend or terminate any Parent Material Contract or waive, release or assign any material rights or claims thereunder, which if so entered into, modified, amended, terminated, waived, released or assigned would reasonably be expected to (A) result in a Parent Material Adverse Effect, (B) impair in any material respect the ability of

Parent to perform its obligations under this Agreement or (C) prevent or materially delay the consummation of the transactions contemplated by this Agreement;

(ix)    except as required pursuant to existing written agreements or Parent Benefit Plans in effect as of the date hereof and provided or made available to SMB, or as otherwise required by Law, (A) increase the compensation or other benefits payable or to become payable to directors or executive officers of Parent or any of its Subsidiaries except in the ordinary course of business consistent with past practices (including, for this purpose, the normal salary, bonus and equity compensation review process conducted each year), (B) grant any severance or termination pay to, or enter into any severance agreement with any director or executive officer of Parent or any of its Subsidiaries, other than in the ordinary course of business consistent with past practice, (C) enter into any employment agreement with any executive officer of Parent or its Subsidiaries (except to the extent necessary to replace a departing employee and except for extension of employment agreements in the ordinary course of business consistent with past practice), or (D) establish, adopt, enter into or amend any collective bargaining agreement, plan, trust, fund, policy or arrangement for the benefit of any current or former directors, officers or employees or any of their beneficiaries;

(x)    except as required by GAAP, make any change in accounting methods, principles or practices;

(xi)    take any action or omit to take any action that is reasonably likely to result in any of the conditions of the Merger set forth in Article VI not being satisfied; or

(xii)    authorize any of, or commit, resolve, propose or agree to take any of, the foregoing actions.

(b)    Conduct of Business by Empagio and SMB.  During the period from the date of this Agreement to the Effective Time, except as otherwise set forth in Section 4.01(b) of the SMB Disclosure Schedule or as consented to in writing (which consent shall not be unreasonably withheld or delayed) in advance by Parent or as otherwise expressly permitted or required under this Agreement, Empagio and SMB shall, and shall cause each of their respective Subsidiaries to, carry on its business in the ordinary course consistent with past practice and in compliance in all material respects with all applicable Laws and, to the extent consistent therewith, use commercially reasonable efforts to preserve substantially intact its current business organization, keep available the services of its current officers, employees and consultants who are integral to the operation of its business and preserve substantially its relationships with customers, vendors and others having material business dealings with it. In addition to and without limiting the generality of the foregoing, during the period from the date of this Agreement to the Effective Time, except as otherwise set forth in Section 4.01(b) of the SMB Disclosure Schedule or as otherwise expressly permitted or required under this Agreement, Empagio and SMB shall not, and shall not permit any of their respective Subsidiaries to, without Parent 's prior written consent (which consent shall not be unreasonably withheld or delayed):

(i)    (A) declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock or property) in respect of, any of its capital stock or membership interests, as applicable, other than dividends or distributions by a direct or indirect

wholly-owned Subsidiary of SMB to its stockholders, (B) split, combine or reclassify any of its capital stock or membership interests, as applicable, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or membership interests, as applicable, or (C) purchase, redeem or otherwise acquire any shares of its capital stock or any other securities thereof or any options, warrants, calls or rights to acquire any such shares or other securities, other than in connection with the forfeiture of Empagio Unit Options or SMB Stock Options;

      (ii)    issue, sell, grant, pledge or otherwise encumber or subject to any Lien any shares of its capital stock or membership interests, as applicable, any other voting securities or any securities convertible into, or any rights, warrants or options to acquire, any such shares, membership interests, voting securities or convertible securities, or any "phantom" stock, "phantom" stock rights, stock appreciation rights or stock-based performance units, including pursuant to Contracts as in effect on the date hereof (other than (A) the issuance of Empagio Common Units or SMB Common Stock upon the exercise of Empagio Unit Options or SMB Stock Options, respectively, outstanding on the date hereof in accordance with their terms on the date hereof and (B) as required under any SMB Benefit Agreement or SMB Benefit Plan in effect on the date hereof);

      (iii)    amend the Certificate of Incorporation or By-laws of SMB or other comparable charter or organizational documents of any of its Subsidiaries, in each case except as may be required by Law;

      (iv)    directly or indirectly acquire (A) by merging or consolidating with, or by purchasing assets of, or by any other manner, any Person or division, business or equity interest of any Person or (B) any asset or assets that, individually, has a purchase price in excess of $250,000 or, in the aggregate, have a purchase price in excess of $500,000, except for new capital expenditures, which shall be subject to the limitations of clause (vii) below, and except for purchases of supplies, equipment or other items in the ordinary course of business consistent with past practice;

      (v)    sell, lease, license, mortgage, sell and leaseback or otherwise encumber or subject to any Lien (other than Permitted Liens) or otherwise dispose of any of its material properties or other material assets or any interests therein, except for sales of used equipment in the ordinary course of business consistent with past practice or modify, amend, terminate or permit the lapse of any material Lease or other material Contract relating to any real property;

      (vi)    (A) incur any indebtedness for borrowed money in excess of $10,000,000 or guarantee any such indebtedness of another person, issue or sell any debt securities or calls, options, warrants or other rights to acquire any debt securities of Empagio, SMB or any of their Subsidiaries or guarantee any debt securities of another Person or (B) make any loans, advances or capital contributions to, or investments in, any other Person, other than to employees in respect of travel or other customary business expenses in the ordinary course of business consistent with past practice;

(vii)    make any new capital expenditure or expenditures which, individually, is in excess of $250,000 or, in the aggregate, are in excess of $500,000;

(viii)    enter into, modify, amend or terminate any SMB Material Contract or waive, release or assign any material rights or claims thereunder, which if so entered into, modified, amended, terminated, waived, released or assigned would reasonably be expected to (A) result in an SMB Material Adverse Effect, (B) impair in any material respect the ability of Empagio or SMB to perform its obligations under this Agreement or (C) prevent or materially delay the consummation of the transactions contemplated by this Agreement;

(ix)    enter into any Contract containing any restriction on the ability of Empagio , SMB or any of their Subsidiaries to assign its rights, interests or obligations thereunder, unless such restriction expressly excludes any assignment to Parent, Merger Sub or any of their Subsidiaries in connection with or following the consummation of the Merger and the other transactions contemplated by this Agreement;

(x)    except as required pursuant to existing written agreements or SMB Benefit Plans in effect as of the date hereof and provided or made available to Parent, or as otherwise required by Law, (A) increase the compensation or other benefits payable or to become payable to directors or executive officers of the Empagio, SMB or any of their Subsidiaries, (B) grant any severance or termination pay to, or enter into any severance agreement with any director or executive officer of Empagio, SMB or any of their Subsidiaries, (C) enter into any employment agreement with any executive officer of Empagio, SMB or any of their Subsidiaries, or (D) establish, adopt, enter into or amend any collective bargaining agreement, plan, trust, fund, policy or arrangement for the benefit of any current or former directors, officers or employees or any of their beneficiaries;

(xi)    except as required by GAAP, make any change in accounting methods, principles or practices;

(xii)    take any action or omit to take any action that is reasonably likely to result in any of the conditions of the Merger set forth in Article VI not being satisfied; or

(xiii)    authorize any of, or commit, resolve, propose or agree to take any of, the foregoing actions.

(c)    No Control of Other Party's Business.  Nothing contained in this Agreement is intended to give Empagio or SMB, directly or indirectly, the right to control or direct Parent 's, Merger Sub's or their Subsidiaries' operations prior to the Effective Time, and nothing contained in this Agreement is intended to give Parent or Merger Sub, directly or indirectly, the right to control or direct Empagio's, SMB's or their Subsidiaries' operations prior to the Effective Time  Prior to the Effective Time, each of Empagio, SMB, Parent and Merger Sub shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

SECTION 4.02    <u>No Solicitation</u>.

(a)    From and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated, and except as otherwise provided for in this Agreement, Parent, Empagio and SMB shall not, and none of them shall authorize or permit any of their respective Subsidiaries, directors, officers or employees to, and each of them shall use their reasonable best efforts to cause its investment bankers, financial advisors, attorneys, accountants or other advisors, agents or representatives (collectively, "*Representatives*") retained by it or any of its Subsidiaries not to, directly or indirectly through another Person, (i) solicit, initiate or knowingly encourage, or take any other action designed to, or which would reasonably be expected to, facilitate, any Takeover Proposal or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any information, or otherwise cooperate in any way with, any Takeover Proposal. Notwithstanding the foregoing, at any time prior to obtaining the Stockholder Approval, in response to a bona fide written Takeover Proposal that the Board of Directors of Parent determines in good faith (after consultation with outside counsel) constitutes or is reasonably likely to lead to a Superior Proposal, and which Takeover Proposal was not solicited after the date hereof and was made after the date hereof and did not otherwise result from a breach of this Section 4.02(a), Parent may, if its Board of Directors determines in good faith (after consultation with outside counsel) that the failure to do so would be reasonably likely to result in a breach of its fiduciary duties to its stockholders under applicable Law, and subject to compliance with Section 4.02(b), (i) furnish information with respect to it and its Subsidiaries to the Person making such Takeover Proposal (and its Representatives) pursuant to a customary confidentiality agreement (which (A) need not restrict such person from making any unsolicited Takeover Proposal and (B) shall permit Parent to comply with the terms of Section 4.02(c)); provided that all such information has previously been provided to Empagio or SMB, or is provided to Empagio or SMB prior to or substantially concurrent with the time it is provided to such Person, and (ii) participate in discussions or negotiations with the person making such Takeover Proposal (and its Representatives) regarding such Takeover Proposal.

(b)    Neither the Board of Directors of Parent nor any committee thereof shall (i) (A) withdraw, or publicly propose to withdraw, the approval, recommendation or declaration of advisability by such Board of Directors or any such committee thereof of this Agreement, the Merger or the other transactions contemplated by this Agreement or (B) recommend, adopt or approve, or propose publicly to recommend, adopt or approve, any Takeover Proposal (any action described in this clause (i) being referred to as a "*Company Adverse Recommendation Change*") or (ii) approve or recommend, or propose to approve or recommend, or allow Parent or any of its Subsidiaries to execute or enter into, any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, option agreement, joint venture agreement, partnership agreement or other similar agreement constituting or related to, or that is intended to or would reasonably be expected to lead to, any Takeover Proposal (other than a confidentiality agreement referred to in Section 4.02(a)) (an "*Acquisition Agreement*"). Notwithstanding the foregoing, at any time prior to obtaining the Stockholder Approval, the Board of Directors of Parent may, if such Board of Directors determines in good faith (after consultation with outside counsel) that the failure to do so would be reasonably likely to result in a breach of its fiduciary duties to the stockholders of Parent under applicable law, (x) make a Company Adverse Recommendation Change or (y) in response

to a Superior Proposal that was not solicited after the date hereof and was made after the date hereof and did not otherwise result from a breach of this Section 4.02, cause Parent to terminate this Agreement (and concurrently with such termination enter into an Acquisition Agreement with respect to such Superior Proposal); provided, however, that (1) no Company Adverse Recommendation Change may be made and (2) no such termination of this Agreement by Parent may be made, in each case until after the third business day following SMB's receipt of written notice from Parent advising SMB that the Board of Directors of Parent intends to make a Company Adverse Recommendation Change or terminate this Agreement pursuant to this Section 4.02(b). Such notice from Parent to SMB shall specify the reasons therefor, including the terms and conditions of any Superior Proposal that is the basis of the proposed action by the Board of Directors (it being understood and agreed that any amendment to the financial terms or any other material term of such Superior Proposal shall require a new written notice by Parent and a new three business day period). In determining whether to make a Company Adverse Recommendation Change or to terminate this Agreement pursuant to this Section 4.02(b), the Board of Directors of Parent shall take into account any changes to the financial terms of this Agreement proposed by Parent in response to any such written notice by Parent or otherwise.

(c)    In addition to the obligations of Parent set forth in Sections 4.02(a) and (b), Parent shall promptly advise SMB orally and in writing of any Takeover Proposal, the material terms and conditions of any such Takeover Proposal (including any changes thereto) and the identity of the person making any such Takeover Proposal. Parent shall (i) keep SMB fully informed of the status and details (including any change to the terms thereof) of any such Takeover Proposal and any discussions and negotiations concerning the material terms and conditions thereof and (ii) provide to SMB any written proposals, term sheets, amendments, drafts of agreements and similar written documents exchanged between Parent or any of its officers, directors, investment bankers, attorneys, accountants or other advisors, on the one hand, and the party making a Takeover Proposal or any of its officers, directors, investment bankers, attorneys, accountants or other advisors, on the other hand, as promptly as reasonably practicable after receipt or delivery thereof.

(d)    Nothing contained in this Section 4.02 shall prohibit Parent from (i) taking and disclosing to its stockholders a position contemplated by Rule 14e-2(a) promulgated under the Exchange Act or (ii) making any disclosure to the stockholders of Parent if, in the good faith judgment of the Board of Directors of Parent (after consultation with outside counsel), failure to so disclose would be inconsistent with its obligations under applicable Law; provided that disclosures under this Section 4.02(d) shall not be a basis, in themselves, for SMB to terminate this Agreement pursuant to Section 7.01.

ARTICLE V.
ADDITIONAL AGREEMENTS

SECTION 5.01    Preparation of the Proxy Statement. As promptly as practicable following the date of this Agreement and receipt of the Financials Audit and other information to be provided by Empagio and/or SMB hereunder, Parent shall prepare and file with the SEC the Proxy Statement. The Proxy Statement shall present proposals relating to the Merger, issuance of the Merger Consideration, the Redomestication, approval of the Certificate of Incorporation of Parent following the Redomestication in the Form of Exhibit D hereto, approval of the By-laws

of Parent following the Redomestication in the Form of Exhibit E hereto, and any other matters that are appropriate in connection with the transactions contemplated by this Agreement. Parent shall use its commercially reasonable efforts to have the Proxy Statement cleared by the SEC as promptly as practicable and to cause the Proxy Statement to be mailed to the stockholders of Parent as promptly as practicable following such filing. Empagio and/or SMB shall promptly furnish all information that may be reasonably requested by Parent in connection with any such actions. Parent shall promptly notify SMB upon the receipt of any comments from the SEC or the staff of the SEC or any request from the SEC or the staff of the SEC for amendments or supplements to the Proxy Statement and shall provide SMB with copies of all correspondence between Parent and the SEC. Notwithstanding the foregoing, prior to filing or mailing the Proxy Statement (or any amendment or supplement thereto) or responding to any comments of the SEC or the staff of the SEC with respect thereto, Parent shall provide SMB an opportunity to review and comment on such document or response and shall include in such document or response all reasonable comments proposed by SMB.

SECTION 5.02     Access to Information; Confidentiality. Subject to applicable Law, upon reasonable notice, Parent, Empagio and SMB shall (and shall cause their respective Subsidiaries to) afford the other and the other's Representatives reasonable access, during normal business hours throughout the period prior to the earlier of the Effective Time or the termination of this Agreement, to its employees, properties, books, contracts and records and, during such period, each shall (and shall cause its respective Subsidiaries to) furnish promptly to the other all information concerning its business, properties and personnel as may reasonably be requested, provided that no investigation pursuant to this Section 5.02 shall affect or be deemed to modify any representation or warranty made herein. Except for disclosures expressly permitted by the terms of the letter of intent dated January 8, 2008, between Empagio and Parent (the "*Letter of Intent*"), each of Parent, Empagio and SMB shall hold, and shall cause its officers, employees, accountants, counsel, financial advisors and other Representatives to hold, all information received from the other party, directly or indirectly, in confidence in accordance with the confidentiality provisions of the Letter of Intent.

SECTION 5.03     Commercially Reasonable Efforts. Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Merger and the other transactions contemplated by this Agreement, including using commercially reasonable efforts to accomplish the following: (i) the taking of all acts necessary to cause the conditions to Closing to be satisfied as promptly as practicable, (ii) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Entities and the making of all necessary registrations and filings (including filings with Governmental Entities) and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity and (iii) the obtaining of all necessary consents, approvals or waivers from third parties; provided that none of Parent , Merger Sub, Empagio or SMB shall be required to make any payment to any such third parties or concede anything of value to obtain such consents from any such third parties.

SECTION 5.04     Governmental Approvals. Each of the parties will, as promptly as practicable, but in no event later than as required by applicable Law following the execution and delivery of this Agreement, file with (i) the United States Federal Trade Commission (the "*FTC*") and the United States Department of Justice (the "*DOJ*") the notification and report form required for the transactions contemplated by this Agreement and any supplemental information requested in connection therewith pursuant to the HSR Act, and (ii) any other Governmental Entity, any other filings, reports, information and documentation required for the transactions contemplated by this Agreement pursuant to any Other Antitrust Laws. Each party will furnish to each other's counsel such necessary information and assistance as the other may reasonably request in connection with its preparation of any filing or submission that is necessary under the HSR Act and any Other Antitrust Laws. SMB and Parent will be equally responsible for all filing fees payable in connection with such filings and for the reasonable fees and expenses of any experts retained by the parties. Each of SMB and Parent agrees to instruct their respective counsel to cooperate with each other and use their respective commercially reasonable efforts to facilitate and expedite the identification and resolution of any issues arising under the HSR Act and any Other Antitrust Laws at the earliest practicable dates. The commercially reasonable efforts and cooperation of each party as set forth in Section 5.03 will include causing its counsel (i) to promptly inform the other of any oral communication with, and provide copies of written communications with, any Governmental Entity regarding any such filings or applications or any such transaction, (ii) to communicate with each other regarding the content of any communication with and response to personnel of such Governmental Entity, including the content of any written or oral presentation or submission to any Governmental Entity and (iii) to comply promptly with any inquiries or requests for additional information from any such Governmental Entity, unless otherwise agreed to by the other party, such agreement not to be unreasonably withheld. None of Parent, Empagio, SMB or any of their respective Subsidiaries will independently participate in any meeting or discussion with any Governmental Entity in respect of any such filings, applications, investigation or other inquiry without giving, in the case of Empagio and/or SMB and their Subsidiaries, Parent, and in the case of Parent and Merger Sub and its Subsidiaries, SMB, prior notice of the meeting and, to the extent permitted by the relevant Governmental Entity, the opportunity to attend and participate (which, at the request of Parent or SMB, as applicable, will be limited to outside antitrust counsel only). None of Parent, Merger Sub, Empagio or SMB shall take any action that would reasonably be expected to hinder or delay in any material respect the obtaining of clearance or the expiration of the required waiting period under the HSR Act and regulations or any Other Antitrust Laws. Nothing in this Agreement shall be deemed to require Parent, Empagio or SMB to agree to, or proffer to, (x) divest or hold separate any assets or any portion of any business or modify or accept conditions with respect to any business operations, or (y) divest or hold separate any significant assets or any significant portion of any business of, or modify or accept conditions with respect to any significant portion of its business operations.

SECTION 5.05     Indemnification; Advancement of Expenses; Exculpation and Insurance.

(a)     Parent, Empagio and SMB agree that all rights to exculpation and indemnification, to the extent permitted by applicable Law, for acts or omissions occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time

(including any matters arising in connection with the transactions contemplated by this Agreement), now existing in favor of the current or former directors, officers and employees ("*Indemnitees*"), as the case may be, of Parent or its Subsidiaries as provided in Parent Articles, Parent By-laws or their respective certificates of incorporation or bylaws (or comparable organization documents) shall survive the Merger and shall continue in full force and effect. Parent shall indemnify, defend and hold harmless, and advance expenses to Indemnitees with respect to all acts or omissions by them in their capacities as such at any time prior to the Effective Time, to the fullest extent permitted by: (i) the Parent Articles, Parent By-laws or the respective certificates of incorporation or bylaws (or equivalent organizational documents) of any of its Subsidiaries or Affiliates as in effect on the date of this Agreement and as permitted by applicable Law; and (ii) any indemnification agreements of Parent or its Subsidiaries or other applicable contract as in effect on the date of this Agreement provided or made available to Empagio or SMB prior to the date hereof.

(b)    Without limiting the provisions of Section 5.05(a), during the period ending on the sixth anniversary of the Effective Time, Parent will, to the full extent permitted by applicable Law: (i) indemnify and hold harmless each Indemnitee against and from any costs or expenses (including attorneys' fees), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, to the extent such claim, action, suit, proceeding or investigation arises out of or pertains to: (A) any action or omission or alleged action or omission in such Indemnitee's capacity as a director, officer or employee of Parent or any of its Subsidiaries or Affiliates; or (B) the Merger, this Agreement and the transactions contemplated hereby; and (ii) pay in advance of the final disposition of any such claim, action, suit, proceeding or investigation the expenses (including attorneys' fees) of any Indemnitee upon receipt of an undertaking by or on behalf of such Indemnitee to repay such amount if it shall ultimately be determined that such Indemnitee is not entitled to be indemnified. Notwithstanding anything to the contrary contained in this Section 5.05(b) or elsewhere in this Agreement, Parent shall not settle or compromise or consent to the entry of any judgment or otherwise seek termination with respect to any claim, action, suit, proceeding or investigation for which indemnification may be sought under this Section 5.05(b) unless such settlement, compromise, consent or termination includes an unconditional release of all Indemnitees from all liability arising out of such claim, action, suit, proceeding or investigation.

(c)    Parent will provide, for a period of not less than six years after the Effective Time, (i) the Indemnitees who are insured under Parent 's directors' and officers' insurance and indemnification policy with an insurance and indemnification policy that provides coverage for events occurring at or prior to the Effective Time (the "*D&O Insurance*") that is no less favorable in any material respect in the aggregate than the existing policy of Parent or, if substantially equivalent insurance coverage is unavailable, the best available coverage, or (ii) a non-cancellable "tail" coverage insurance policy under Parent 's current directors' and officers' liability insurance policies (providing coverage not less favorable than provided by such insurance in effect on the date hereof) with respect to matters existing or occurring at or prior to the Effective Time.

(d)     The Indemnitees to whom this Section 5.05 applies shall be third party beneficiaries of this Section 5.05. The provisions of this Section 5.05 are intended to be for the benefit of each Indemnitee and his or her heirs and representatives.

(e)     Notwithstanding anything contained in Section 9.05 hereof to the contrary, this Section 5.05 shall survive the consummation of the Merger indefinitely and shall be binding on all successors and assigns of Empagio, SMB and Parent, and shall be enforceable by the Indemnitees and their successors, heirs or representatives. In the event that Parent or any of its successors or assigns consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or transfers or conveys all or a majority of its properties and assets to any Person, then, and in each such case, proper provision shall be made so that the successors and assigns of Parent shall succeed to the obligations set forth in this Section 5.05.

SECTION 5.06     Fees and Expenses.  Except as otherwise provided in Sections 5.04 and Section 7.02, whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the Merger and the other transactions contemplated by this Agreement, including fees owing to brokers, finders and financial advisers, shall be paid by the party incurring such expense.  All expenses incurred in connection with the printing and mailing of the Proxy Statement shall be paid by Parent.

SECTION 5.07     Public Announcements.  Parent, Empagio and SMB shall consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other public statements with respect to the transactions contemplated by this Agreement, including the Merger, and shall not issue any such press release or make any such public statement prior to such consultation, except as such party may reasonably conclude may be required by applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or national securities quotation system.

SECTION 5.08     Listing.  Parent shall use its commercially reasonable efforts to cause Parent Common Stock to be issued in the Merger to be approved for listing on the Nasdaq, as promptly as practicable, and in any event prior to the Effective Time.

SECTION 5.09     Audited Financial Statements.  SMB shall use its commercially reasonable efforts to deliver to Parent on or prior to May 30, 2008 SMB's consolidated and consolidating financial statements and the financial statements for all predecessor entities for the periods required by the Exchange Act and prepared in accordance with the applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, in a form and of substance reasonably acceptable to Parent, audited by McGladrey & Pullen, LLP (the "*Financials Audit*").

SECTION 5.10     Anti-takeover Statutes.  If any applicable "moratorium," "control share," "fair price," "affiliate transaction," "business combination" or other anti-takeover Laws and regulations of any state (collectively, "*Takeover Statutes*") is or may become applicable to the Merger, Parent, Merger Sub, Empagio and SMB shall take such actions as are necessary so that the transactions contemplated by this Agreement may be consummated as promptly as

practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of any Takeover Statute on the Merger.

SECTION 5.11    Tax-Free Reorganization Treatment. Parent, Merger Sub, Empagio and SMB intend that the Merger will qualify as a reorganization within the meaning of Section 368(a) of the Code, and each shall, and shall cause their respective Subsidiaries to, use commercially reasonable efforts to cause the Merger to so qualify. None of Parent, Merger Sub, Empagio or SMB shall knowingly take any action, or knowingly fail to take any action, that would be reasonably likely to jeopardize the qualification of the Merger as a reorganization within the meaning of Section 368(a) of the Code.

SECTION 5.12    Working Capital Calculation. Within 15 days prior to the contemplated Closing Date as agreed to by Parent and SMB, Parent shall prepare and deliver to McGladrey & Pullen, LLP a working capital statement (the "**Working Capital Report**") setting forth the current assets and current liabilities of Parent as of the previous business day and a calculation of the Parent Working Capital. Not later than the next business day following delivery of the Working Capital Report to McGladrey & Pullen, LLP, McGladrey & Pullen, LLP shall deliver to Parent and SMB, via facsimile in accordance with Section 9.01 hereunder, written notice (the "**Working Capital Notice**") setting forth the Parent Working Capital. The findings of McGladrey & Pullen, LLP contained in the Working Capital Notice shall be final and binding on Parent and SMB. The costs and expenses associated with McGladrey & Pullen, LLP's review of the Working Capital Report shall be paid by Parent.

SECTION 5.13    Securities Conversion. Empagio and/or SMB shall cause all Empagio Unit Options, Empagio Warrants, SMB Stock Otions, SMB Warrants and other notes and securities convertible into equity in Empagio or SMB to be terminated or converted into SMB Common Stock prior to Closing.

ARTICLE VI.
CONDITIONS PRECEDENT

SECTION 6.01    Conditions to Each Party's Obligation to Effect the Merger. The respective obligation of each party to effect the Merger is subject to the satisfaction or waiver by all parties on or prior to the Closing Date of the following conditions:

(a)    Stockholder Approval. The Stockholder Approval shall have been obtained.

(b)    Antitrust Laws. The waiting periods (and any extensions thereof) applicable to the Merger under the HSR Act and any Other Antitrust Laws shall have been terminated or shall have expired, and none of the FTC, DOJ or any other Governmental Entity shall have taken action that has not been dismissed or otherwise disposed of to delay, prohibit or otherwise restrain the transactions contemplated by this Agreement.

(c)    Listing. Parent Common Stock issuable to Empagio or its members pursuant to this Agreement shall have been authorized or conditionally approved for listing with the Nasdaq and Parent's listing with the Nasdaq shall not have been terminated.

(d)     No Injunctions or Restraints.  No temporary restraining order, preliminary or permanent injunction or other judgment or order issued by any court of competent jurisdiction or under any Law or legal restraint or prohibition (collectively, "**Restraints**") shall be in effect (i) preventing the consummation of the Merger or (ii) which otherwise has had or would reasonably be expected to have a Parent Material Adverse Effect or SMB Material Adverse Effect (provided that the enforcement of the condition set forth in this Section 6.01(d) by SMB with respect to any Restraint shall be subject to SMB's prior satisfaction of its obligations pursuant to Section 5.03 to the extent applicable to such Restraint).

SECTION 6.02     Conditions to Obligations of Empagio and SMB.  The obligations of Empagio and SMB to effect the Merger are further subject to the satisfaction or waiver by SMB on or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties.  (i) The representations and warranties of Parent and Merger Sub contained in this Agreement that are qualified by reference to a Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) and (ii) all other representations and warranties of Parent and Merger Sub contained in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be so true and correct, individually and in the aggregate, has not had and would not reasonably be expected to have a Parent Material Adverse Effect.  SMB shall have received a certificate signed on behalf of Parent and Merger Sub by the Chief Executive Officer of Parent and Merger Sub to such effect.

(b)     No Parent Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred any Parent Material Adverse Effect.

(c)     Performance of Obligations of Parent and Merger Sub.  Parent and Merger Sub shall have performed all obligations required to be performed by them under this Agreement at or prior to the Closing Date, except where any such failure, individually and in the aggregate, would not have a Parent Material Adverse Effect, and SMB shall have received a certificate signed on behalf of Parent and Merger Sub by the Chief Executive Officer of Parent and Merger Sub to such effect.

(d)     Certificate of Conversion.  Parent shall have filed with the office of the Secretary of State of Delaware a certificate of conversion and all such other documents as may be required under the DGCL, together with all such documents that may be required under Canadian Law, pursuant to which Parent converts from a Canadian corporation to a Delaware corporation, and such filings shall have become effective.

(e)     Board Composition.  Effective at the Effective Time, the Board of Directors of Parent shall be as set forth in Section 6.02(e) of the Parent Disclosure Schedule.

(f)     Consents.  Parent shall have obtained each of the consents set forth in Section 6.02(f) of Parent Disclosure Schedule.

(g)     Registration Rights Agreement.  Parent shall have executed and delivered to Empagio or SMB a Registration Rights Agreement in the form of Exhibit B hereto.

(h)     Escrow Agreement.  Each of Parent and Merger Sub shall have executed and delivered the Escrow Agreement.

(i)     Agreement with Special Warrant Holders.  Each of Parent and the holders of Special Warrants in Parent shall have entered into an agreement to amend such Special Warrants on the terms substantially set forth in Section 6.02(i) of the Parent Disclosure Schedule.

(j)     Positive Working Capital.  McGladrey & Pullen, LLP shall have delivered to Parent and SMB pursuant to Section 5.12 a Working Capital Notice setting forth that the Parent Working Capital is a positive number.

(k)     Mullarkey Release of Rights.  Michael Mullarkey shall have agreed to release any rights he may have to receive proceeds from the sale or other disposition of any assets of Parent.

(l)     Nasdaq Application.  If Parent is required to apply for initial listing on the Nasdaq Capital Market pursuant to Nasdaq Marketplace Rule 4340 in connection with the Merger, Nasdaq shall have approved the initial listing.

SECTION 6.03     Conditions to Obligation of Parent .  The obligation of Parent to effect the Merger is further subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties.  (i) The representations and warranties of the Empagio and SMB contained in this Agreement that are qualified by reference to a Material Adverse Effect shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date) and (ii) all other representations and warranties of Empagio and SMB contained in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be so true and correct, individually and in the aggregate, has not had and would not reasonably be expected to have an SMB Material Adverse Effect.  Parent shall have received a certificate signed on behalf of the Empagio and SMB by the Chief Executive Officer of Empagio and SMB to such effect.

(b)     No SMB Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred any SMB Material Adverse Effect.

(c)    <u>Performance of Obligations of Empagio and SMB</u>.  Empagio and SMB shall have performed all obligations required to be performed by them under this Agreement at or prior to the Closing Date, except where any such failure, individually and in the aggregate, would not have a Parent Material Adverse Effect, and Parent shall have received a certificate signed on behalf of Empagio and SMB by the Chief Executive Officer of Empagio and SMB to such effect.

(d)    <u>Lock-Up Agreement</u>.  Seth Bernstein and Chatham Credit Management III, LLC shall have executed and delivered to Parent a Lock-up Agreement in the form of Exhibit C hereto.

(e)    <u>Certificates</u>.  Empagio or, in the event of a dissolution of Empagio prior to Closing, its members shall have delivered the Certificates pursuant to Section 2.02(a).

(f)    <u>Escrow Agreement; Stock Powers</u>.  Empagio or, in the event of a dissolution of Empagio prior to Closing, each Person that is to receive Merger Consideration shall have executed and delivered the Escrow Agreement and a duly executed stock power with respect to each certificate to be held pursuant to the terms of the Escrow Agreement in a form acceptable to Parent.

(g)    <u>Investor Representations</u>.  In the event that Empagio is dissolved prior to Closing, each Person that is to receive Merger Consideration shall have executed and delivered an investors representation letter in form and substance acceptable to Parent.

(h)    <u>Investor Rights Agreement</u>.  The Investor Rights Agreement dated May 14, 2007, among Empagio, Seth Bernstein, Robert Purceful and Chatham Credit Management III, LLC, as amended, shall have been terminated prior to the Closing.

SECTION 6.04    <u>Frustration of Closing Conditions</u>.  None of Parent , Merger Sub, Empagio or SMB may rely on the failure of any condition set forth in Section 6.01, 6.02 or 6.03, as the case may be, to be satisfied if such failure was caused by such party's failure to act in good faith or to use its commercially reasonable efforts to consummate the Merger and the other transactions contemplated by this Agreement, as required by and subject to Section 5.03.

ARTICLE VII.
TERMINATION, AMENDMENT AND WAIVER

SECTION 7.01    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Effective Time, whether before or after receipt of the Stockholder Approval:

(a)    by mutual written consent of Parent and SMB;

(b)    by either Parent or SMB:

(i)    if the Merger shall not have been consummated on or before September 30, 2008; provided that the right to terminate this Agreement pursuant to this Section 7.01(b)(i) shall not be available to any party that has breached in any material respect its

obligations under this Agreement that shall have proximately caused or resulted in the failure of a condition to the consummation of the Merger; or

(ii)     immediately if any of the conditions set forth in Section 6.01(a), (b) or (d)(i) shall become incapable of being satisfied;

(iii)     if any of the conditions set forth in Section 6.01(c) or (d)(ii) shall become incapable of being satisfied with commercially reasonable efforts and shall not have been waived by September 30, 2008;

(iv)     if the Stockholder Approval shall not have been obtained at the Stockholders' Meeting duly convened therefor or at any adjournment or postponement thereof;

(c)     by SMB if any of the conditions set forth in Section 6.02 shall become incapable of being satisfied with commercially reasonable efforts and shall not have been waived by September 30, 2008;

(d)     by Parent if any of the conditions set forth in Section 6.03 shall become incapable of being satisfied with commercially reasonable efforts and shall not have been waived by September 30, 2008;

(e)     by Parent or SMB if Parent accepts a Superior Proposal; or

(f)     by Parent if the Financials Audit has not been completed and delivered to Parent on or prior to May 30, 2008.

SECTION 7.02     Effect of Termination.

(a)     In the event of termination of this Agreement by either Empagio or SMB, on the one hand, or Parent, on the other hand, as provided in Section 7.01, this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of Parent, Merger Sub, Empagio or SMB, except for the agreements set forth in the last sentence of Section 5.02, Section 5.06, this Section 7.02 and Article IX, which provisions shall survive such termination, and except to the extent that such termination results from the willful and material breach by a party of any of its representations, warranties, covenants or agreements set forth in this Agreement.

(b)     In the event that this Agreement is terminated by Parent pursuant to Section 7.01(d) or (f), then Empagio and SMB shall jointly and severally pay Parent within five business days of the date of termination a termination fee of $5,000,000 by wire transfer of immediately available funds to an account designated by Parent.

(c)     In the event that this Agreement is terminated by SMB pursuant to Section 7.01(c) or (e) (other than due to Parent's failure to satisfy the conditions set forth in Section 6.02(d) as a result of Parent's failure to obtain the Stockholder Approval, Section 6.02(j) or 6.02(l) or perform the covenant contained in Section 5.08), then Parent shall pay SMB within five business days of the date of termination pursuant to Section 7.01(c) or the consummation of

the transaction contemplated by the Superior Proposal a termination fee of $3,000,000 by wire transfer of immediately available funds to an account designated by SMB.

(d)     SMB and Parent agree that the agreements contained in Sections 7.02(b), (c) and (d) are integral parts of the transactions contemplated by this Agreement, and that the payments provided for therein do not constitute a penalty. If either party fails to promptly pay the amounts due under such Sections, the other party shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by the party to which payment is owing in connection with any action, including the filing of any lawsuit, taken to collect payment of such amounts.

SECTION 7.03     Extension; Waiver. At any time prior to the Effective Time, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other parties, (b) to the extent permitted by Law, waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (c) subject to the proviso to the first sentence of Section 9.02 and to the extent permitted by Law, waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party  The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

ARTICLE VIII.
SURVIVAL OF REPRESENTATIONS AND WARRANTIES

SECTION 8.01     Survival of Representations and Warranties. None of the representations, warranties, covenants and agreements of Parent and Merger Sub or Empagio and SMB contained in this Agreement or in any Exhibit, Schedule or instrument delivered pursuant to this Agreement shall survive beyond the Effective Time. This Section 8.01 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time.

ARTICLE IX.
GENERAL PROVISIONS

SECTION 9.01     Notices. Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by facsimile or overnight courier:

| | |
|---|---|
| If to Empagio or SMB, to | Empagio Acquisition LLC<br>225 East Robinson Street<br>Suite 240<br>Orlando, Florida 32801<br>Facsimile: (407) 488-1505<br>Attention: Chief Executive Officer |
| with a copy to: | Rogin Nassau LLC |

185 Asylum Street
Hartford, CT  06103-3460
Facimile: (860) 278-2179
Attention: Steven D. Bartelstone, Esq.

if to Parent or Merger Sub, to:    Workstream Inc.
2600 Lake Lucien Drive
Suite 410
Maitland, Florida 32751
Facsimile: (847) 574-5912
Attention: Chief Executive Officer

with a copy to:    Cozen O'Connor
1900 Market Street
Philadelphia, Pennsylvania 19103
Facsimile: (215) 665-2013
Attention: Michael J. Heller, Esq.

or to such other persons or addresses as may be designated in writing by the party to receive such notice as provided above. Any notice, request, instruction or other document given as provided above shall be deemed given to the receiving party upon actual receipt, if delivered personally; three business days after deposit in the mail if sent by registered or certified mail; upon confirmation of successful transmission if sent by facsimile; or on the next business day after deposit with an overnight courier if sent by an overnight courier.

SECTION 9.02    Amendment.  This Agreement may be amended by the parties hereto at any time before or after receipt of the Stockholder Approval; provided, however, that after such approval has been obtained, there shall be made no amendment that by law requires further approval by the stockholders of Parent without such approval having been obtained.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

SECTION 9.03    Interpretation.  When a reference is made in this Agreement to an Article, a Section, Exhibit or Schedule, such reference shall be to an Article of, a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to "this Agreement" shall include Parent Disclosure Schedule and the SMB Disclosure Schedule.  All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means

such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a person are also to its permitted successors and assigns. In this Agreement, all references to "dollars" or "$" are to United States dollars.

SECTION 9.04     Counterparts. This Agreement may be executed in one or more counterparts (including by facsimile), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

SECTION 9.05     Entire Agreement; No Third-Party Beneficiaries. This Agreement and Section 6 of the Letter of Intent constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this Agreement and the Letter of Intent. Except as provided in Section 5.05, this Agreement is not intended to and does not confer upon any Person other than the parties hereto any legal or equitable rights or remedies.

SECTION 9.06     Governing Law. This agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the choice of law principles thereof.

SECTION 9.07     Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, in whole or in part, by operation of law or otherwise by any of the parties without the prior written consent of the other parties, and any assignment without such consent shall be null and void. This Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and permitted assigns.

SECTION 9.08     Dissolution of Empagio. In the event Empagio is dissolved prior to the Closing, any action required to be taken by Empagio in connection with this Agreement, including the giving of any consent, the granting of any waiver or the amending of any term hereof, shall instead be taken by SMB. For the avoidance of doubt, it shall not be a breach of this Agreement for Empagio not to perform any covenant hereunder after its dissolution.

SECTION 9.09     Consent to Jurisdiction. Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of Delaware or of any state court located in the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court and (c) agrees that it will not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than a federal court located in the State of Delaware or a state court located in the State of Delaware.

SECTION 9.10    Definitions. For purposes of this Agreement:

(a)    "*Affiliate*" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such first Person;

(b)    "*Contract*" means any binding contract, agreement, arrangement or understanding, written, oral or implied, to which any of the parties hereto is a party or by which it or any of its assets are bound or affected, together with all modifications and amendments thereto.

(c)    "*EBITDA*" means net income in accordance with GAAP plus, to the extent deducted: interest expense (which shall include fair value warrant adjustments), taxes, depreciation and amortization, less interest income.

(d)    "*Empagio Unit Options*" means options or similar rights to purchase Empagio Common Units or Empagio Preferred Units from Empagio.

(e)    "*Empagio Warrants*" means any warrants or similar rights to purchase Empagio Common Units or Empagio Preferred Units from Empagio.

(f)    "*Environmental Laws*" means any applicable Law (including common Law) or other legal requirement relating to the protection of natural resources, the environment and public and employee health and safety or pollution or the release or exposure to Hazardous Materials and shall include, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Section 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Clean Water Act (33 U.S.C. Section 1251 et seq.), the Clean Air Act (33 U.S.C. Section 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. Section 7401 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. Section 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. Section 651 et seq.), and the regulations promulgated pursuant thereto, and any such applicable state or local statutes, and the regulations promulgated pursuant thereto, as such Laws have been and may be amended or supplemented through the Closing Date.

(g)    "*Hazardous Material*" means any substance, material or waste which is regulated, classified or otherwise characterized as hazardous, toxic, pollutant, contaminant or words of similar meaning or regulatory effect by any Governmental Entity, and includes, without limitation, petroleum, petroleum by-products and wastes, asbestos and polychlorinated biphenyls.

(h)    "*Knowledge*" means, with respect to any party, the knowledge of such party's executive officers after due inquiry, including inquiry of such party's counsel and other officers or employees of such party responsible for the relevant matter.

(i)    "*Law*" federal, state, local or foreign (including Canadian provincial) law, statute, ordinance, common law or any rule, regulation, standard, judgment, order, writ,

injunction, decree, arbitration award, judicial or administrative doctrine, agency requirement, license or permit of any Governmental Entity.

(j)    *"Other Antitrust Laws"* mean the antitrust and competition Laws of all jurisdictions other than those of the United States, and any other similar applicable Law.

(k)    *"Parent Articles"* means the Articles of Incorporation, as amended, of Parent in effect as of the date hereof.

(l)    *"Parent Benefit Agreement"* means (i) any employment, deferred compensation, consulting, severance, change of control, termination, indemnification, employee benefit, loan, stock repurchase or similar Contract between Parent or any of its Subsidiaries, on the one hand, and any Parent Participant, on the other hand, or (ii) any Contract between Parent or any of its Subsidiaries, on the one hand, and any Parent Participant, on the other hand, the benefits of which are contingent, or the terms of which are materially altered, upon the occurrence of a transaction involving Parent of a nature contemplated by this Agreement.

(m)    *"Parent By-laws"* means the By-laws, as amended, of Parent in effect as of the date hereof.

(n)    *"Parent Material Adverse Change"* or *"Parent Material Adverse Effect"* means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, (i) has a material adverse effect on the business, results of operations or financial condition of Parent and its Subsidiaries taken as a whole or (ii) that prevents or materially impairs Parent's ability to consummate the Merger on a timely basis; provided, however, that in determining whether a Material Adverse Effect has occurred, there shall be excluded any effect to the extent resulting from (A) the announcement or pendency of this Agreement, the transactions contemplated hereby or any action of any party to this Agreement or any of its Subsidiaries required to be taken by it under this Agreement, (B) changes or events after the date of this Agreement in general economic, business or financial conditions or financial markets or credit markets generally, (C) a decrease in the trading or market prices of the Parent Common Stock, (D) the engagement by the United States or Canada in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon or within the United States or Canada or (E) the occurrence or effects of any event or circumstances set forth in Section 9.10(n) of the Parent Disclosure Schedule.

(o)    *"Parent Stock Options"* means options or similar rights to purchase shares of Parent Common Stock from Parent.

(p)    *"Parent Warrants"* means warrants or similar rights to purchase shares of Parent Common Stock from Parent.

(q)    *"Parent Working Capital"* means the current assets of Parent less the current liabilities of Parent; provided that, for purposes of this Agreement, current liabilities shall exclude all long-term debt (except the current portion thereof), liabilities or other obligations in connection with the Parent Special Warrants, costs incurred by Parent in connection with the transactions contemplated by this Agreement and other obligations that accelerate or become due

as a result of the consummation of the transactions contemplated by this Agreement. For purposes of calculating Parent Working Capital under this definition, the fair market value of deferred revenues shall be deemed to equal 30% of its stated value.

(r)    *"Permitted Liens"* means (i) mechanics', carriers', workmen's, repairmen's, maritime or other like Liens arising or incurred in the ordinary course of business relating to obligations that are not delinquent or that are being contested in good faith by any party hereto or any of its Subsidiaries and for which the relevant party has established adequate reserves in accordance with GAAP, (ii) Liens for taxes that are not due and payable or that may thereafter be paid without interest or penalty, (iii) easements, covenants, rights-of-way and other encumbrances or restrictions of record that, individually or in the aggregate, do not materially impair, and would not reasonably be expected to materially impair, the value or the continued use and operation of the assets to which they relate, (iv) zoning, building and other similar codes and regulations, and (v) Liens (other than Liens that secure indebtedness) that, individually or in the aggregate, do not materially interfere with, and would not reasonably be expected to materially interfere with, the ability of any party hereto or any of its Subsidiaries to conduct their respective businesses as currently conducted.

(s)    *"Person"* means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity;

(t)    *"SMB Benefit Agreement"* means (i) any employment, deferred compensation, consulting, severance, change of control, termination, indemnification, employee benefit, loan, stock repurchase or similar Contract between Empagio, SMB or any of their Subsidiaries, on the one hand, and any SMB Participant, on the other hand, or (ii) any Contract between Empagio, SMB or any of their Subsidiaries, on the one hand, and any SMB Participant, on the other hand, the benefits of which are contingent, or the terms of which are materially altered, upon the occurrence of a transaction involving Empagio or SMB of a nature contemplated by this Agreement.

(u)    *"SMB EBITDA"* means EBITDA for the 12-month period following Closing, plus: non-cash stock-based expense, deferred revenue fair value adjustments, acquisition-related expenses and non-cash asset impairment charges.

(v)    *"SMB Material Adverse Change"* or *"SMB Material Adverse Effect"* means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, (i) has a material adverse effect on the business, results of operations or financial condition of SMB and its Subsidiaries taken as a whole or (ii) that prevents or materially impairs SMB's ability to consummate the Merger on a timely basis; provided, however, that in determining whether a Material Adverse Effect has occurred, there shall be excluded any effect to the extent resulting from (A) the announcement or pendency of this Agreement, the transactions contemplated hereby or any action of any party to this Agreement or any of its Subsidiaries required to be taken by it under this Agreement, (B) changes or events after the date of this Agreement in general economic, business or financial conditions or financial markets or credit markets generally, (C) the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack

upon or within the United States or (D) or the occurrence or effects of any event or circumstances set forth in Section 9.10(v) of the SMB Disclosure Schedule.

(w)    "*SMB Stock Options*" means options or similar rights to purchase shares of SMB Common Stock from SMB.

(x)    "*SMB Warrants*" means warrants or similar rights to purchase shares of SMB Common Stock from SMB.

(y)    "*Stockholder Approval*" means a resolution passed by a majority of not less than two-thirds of the votes cast by the holders of all outstanding shares of Parent Common Stock at the Stockholders' Meeting or any adjournment or postponement thereof to adopt this Agreement, the Merger, the issuance of the Merger Consideration and the Redomestication.

(z)    "*Subsidiary*" of any Person means another person, an amount of the voting securities, other voting rights or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first Person.

(aa)   "*Superior Proposal*" means any bona fide Takeover Proposal that if consummated would result in a transaction that the Board of Directors of Parent has determined in its good faith judgment is: (i) more favorable to the stockholders of Parent from a financial point of view than the Merger and (ii) reasonably capable of being completed, taking into account all financial, legal, regulatory and other aspects of such proposal.

(bb)   "*Takeover Proposal*" means any inquiry, proposal or offer from any Person relating to, or that would reasonably be expected to lead to, any direct or indirect acquisition or purchase, in one transaction or a series of transactions, of assets or businesses that constitute 20% or more of the revenues, net income or the assets of SMB or Parent, as the case may be, and its Subsidiaries, taken as a whole, or 20% or more of any class of equity securities of SMB or Parent, as the case may be, or any of its Subsidiaries, any tender offer or exchange offer that if consummated would result in any Person beneficially owning 20% or more of any class of equity securities of SMB or Parent, as the case may be, or any of its Subsidiaries, or any merger, consolidation, business combination, recapitalization, liquidation, dissolution, joint venture, binding share exchange or similar transaction involving SMB or Parent, as the case may be, or any of its Subsidiaries pursuant to which any Person or the stockholders of any Person would own 20% or more of any class of equity securities of SMB or Parent, as the case may be, or any of its Subsidiaries or of any resulting parent company of SMB or Parent, as the case may be, other than the transactions contemplated by this Agreement.

*[Signature page follows]*

IN WITNESS WHEREOF, Parent, Sub and the Company have caused this Agreement to be signed by their respective officers hereunto duly authorized, all as of the date first written above.

WORKSTREAM INC.

By: _____
    Name: _Michael Mullarkey_
    Title: _Chairman_

WORKSTREAM MERGER SUB INC.

By: _____
    Name: _Michael Mullarkey_
    Title: _Chairman_

EMPAGIO ACQUISITION LLC

By: _____
    Name: _Seth Berqueld_
    Title: _CEO_

SMB CAPITAL CORPORATION

By: _____
    Name: _Seth Berqueld_
    Title: _CEO_

# EXHIBIT B



**HUMAN RESOURCES OUTSOURCING**

Workstream, Inc.
2600 Lake Lucien Drive
Suite 410
Maitland, FL 32751
Attention: Steve Purello, Chief Executive Officer
**Via Fax: (847) 574-5912**

June 13, 2008

Re: **Merger Agreement**

Dear Mr. Purello:

I am writing you in connection with that certain Merger Agreement dated February 12, 2008, among Workstream, Inc. ("Workstream"), Workstream Merger Sub Inc., Empagio Acquisition LLC ("Empagio") and SMB Capital Corporation (the "Agreement"). (Capitalized terms used herein but not defined have the meanings set forth in the Agreement). Based on a number of adverse developments in the business of Workstream and various breaches by Workstream of the Agreement, Empagio is hereby terminating the Agreement.

As you know, we have had a number of recent discussions regarding these developments and our concerns about continuing to pursue the Merger in light of these developments. Unfortunately, Workstream has been unable to address our concerns and Workstream's business continues to deteriorate.

In a prior letter to Workstream, we have indicated grave concerns regarding certain Schedule 13D filings by certain Special Warrant holders which indicate Workstream was pursing a transaction to convert its Special Warrants into debt. In our prior correspondence and our meeting on June 2, 2008, we offered some alternatives to this arrangement. Section 6.02(i) and Schedule 6.02(i) of the Agreement are very specific as to the disposition of the Special Warrants. In sum, the Agreement provides that: (i) the holders of such warrants must waive all current and future penalties and triggering event fees; (ii) in the event 6FigureJobs subsidiary is sold, the proceeds of which are to be paid to the holders of such warrants to redeem and cancel the special warrants (on the terms as described in Schedule 6.01(i)) and any warrants not so redeemed and canceled are to be converted into Workstream common stock; and (iii) if 6FigureJobs is not sold, the Special Warrants must be converted into warrants without the "special" rights as described in Schedule 6.02(i). We have neither received a satisfactory response to our proposals, nor have we received assurances from either Workstream or the Special Warrant holders that the Special Warrants will be disposed of in compliance with the Agreement.

We have also communicated our concerns regarding Workstream's financial and market condition. But for a one-time asset sale described below, Workstream's sales revenues, EBITDA and cash flow are significantly less than the prior year. Based on its performance, we cannot see how by the Closing Date Workstream's



**empagio**

HUMAN RESOURCES OUTSOURCING

declining cash flow, financial and market position would not constitute a Parent Material Adverse Effect, which violates Section 6.02(b) of the Agreement. Workstream is experiencing severe turmoil in its executive, management and sales team. Workstream has reduced its sales staff to three (3) people, which is far below the staffing contained in the pro formas provided to us. A number of key employees have also been terminated. At least one trade publication has observed that Workstream's entire management and sales team is essentially gone and that Workstream has lost all goodwill and is practically invisible in the market. (A copy of this article is attached).

The initial pro formas Workstream supplied to us which were relied on in determining the value of the business and the fairness of the transaction indicated Workstream would be cash flow positive by the fourth quarter of fiscal 2008 (approximately $500,000 a month) *after* the sale of 6FigureJobs. Now, the indications are that even including cash generated by 6FigureJobs, Workstream is cash flow negative. This condition will worsen once 6FigureJobs is sold (as required under the Agreement). These are not developments capable of cure in the next few months. Workstream has entered into a number of amendments to existing client contracts, but is not generating significant new business. We believe these developments are directly attributable to the loss of sales and managerial staff. This is further compounded by the long sales lead time in your company.

We have reviewed the recent sales agreements Workstream has provided us. We believe at least one of these agreements is in and of itself a breach of the Agreement. On April 17, 2008, Workstream amended an existing Software Source Code Purchase and Sale Agreement dated May 31, 2007, with Benefitfocus.com, Inc. to, among other things, sell certain additional material assets of Workstream to Benefitfocus.com, Inc. These items appear to include Workstream's "Communicator" software application and the WYSIWYG web based authoring subsystem of the Communicator application. As consideration for this sale, Workstream has received an additional cash payment of $625,000 above and beyond the original agreement. Section 4.01(a)(v) of the Agreement prohibits the disposition of any material properties or assets of Workstream. A $625,000 sale is material for Workstream and the sale of the assets described in the amendment constitutes a separate breach of the Agreement by Workstream. This one-time sale of a material asset has also provided a one-time boost to Workstream's sales revenue and EBITDA. It does not provide recurring revenue. We also have concerns over the revenue recognition from this sale.

In sum, Workstream is burning cash at an alarming rate (far in excess of the pro formas supplied to us), is not generating new business, has relied on re-working existing contracts and on a one-time asset sale (which will not produce recurring revenue) to stabilize its position and has lost most of its marketing and sales staff. Note that Section 4.01 of the Agreement requires Workstream to "...carry on its business in the ordinary course, consistent with past practice and... use commercially reasonable efforts to preserve substantially its relationships with customers, vendors and other having material business dealings with it." Based on the developments described above, Workstream is in breach of Section 4.01 of the Agreement. Singularly and collectively, the unfavorable business developments described above and the breaches to the Agreement by Workstream constitute a Parent Material Adverse Effect.



**HUMAN RESOURCES OUTSOURCING**

Finally, based on its current performance, we are unable to see how Workstream can comply with Section 6.02(j) of the Agreement which requires Workstream to have positive net working capital as of the Closing Date. Moreover, we have real concerns that Workstream is "managing" its working capital number (and not operating in the ordinary course) by laying off sales, administrative and marketing staffs, the net result of which is the adverse developments in its business as described above. We also believe that you have characterized as transaction expenses items not permitted by the Agreement including expenses related to the sale of 6FigureJobs.

Section 7.01(c) of the Agreement permits us to terminate the Agreement "...if any of the conditions set forth in Section 6.02 of the Agreement shall become incapable of being satisfied with commercially reasonable efforts and shall not have been waived by September 30, 2008." As described above, we have several grounds to terminate the Agreement and we feel we have no alternative but to do so.

Pursuant to Section 7.02(c) of the Agreement, Empagio is entitled to damages arising from its termination of the Agreement. Please wire to Empagio the termination fee of $3,000,000 by wire transfer of immediately available funds as follows:

Fifth Third Bank

Incoming Wire R/T: 042000314
Account#7440642143

Incoming ACH R/T: 063109935

Checks: 063109935

**SWIFT: FTBCUS3CC**

Sincerely yours,

Michael Cooper
Chief Financial Officer
Empagio Acquisition LLC

cc:    Cozen O'Connor
       1900 Market Street
       Philadelphia, PA 19103
       Attention: Michael J. Heller, Esq.
       Via Fax: (215) 665-2013

**ere.net**  Recruiting Intelligence.
Recruiting Community.™

You are not logged in.
log in | register

home | articles | discussions | blogs | inside recruiting | events

search ERE.net [            ] go

NETWORKING: people | groups | recruiting directory

webinars | recruiting jobs | CRL journal | publications

# insiderecruiting

News, analysis, polls and stats from inside the world of recruiting

FREE subscriptions & more ▶ REGISTER TODAY

## 6/3/2008

Got a news story related to
recruiting/HR? Email us about
it.

8:54 a.m. PT
## Can Workstream Hang On?

**Columns**
Weekly Poll
Who's Hiring, Who's Firing
The Vendor Report
Wake-up Call
Tricks of the Trade
Laws & Courts
Podcasts ●»

Battered by losses running into the millions, talent software
provider Workstream (profile; site) is asking vendors to
renegotiate bills as it struggles to lift its stock price above $1 a
share.

A publicly traded company headquartered in Ottawa,
Workstream sells a suite of over-the-web talent management
products and also owns 6FigureJobs.com and Allen and
Associates , a candidate focused career management firm. In
fiscal year 2007, which ended May 31, 2007 Workstream had an
operating loss of $11.1 million on revenues of $29.3 million. This
year through the company's 3rd quarter, which ended Feb. 29th
it had lost $15.5 million on revenues of $20.6 million.

**Weekly Poll**
On the whole, Gen Y
employees tend to be:

☐ Very loyal to your
company.

☐ Loyal if the right work/life
balance is in place.

☐ Disloyal, and also
strategic job-hoppers.

☐ Disloyal, and also
destroying their resumes.

[VOTE] or view results

In November the company was notified by NASDAQ, where its
stock trades, that it was in danger of being delisted by the
exchange because the per share price had fallen below $1 for 30
consecutive trading days. On May 20th, with its stock closing at
50 cents a share, Workstream got a six month extension from
NASDAQ. It now has until Nov. 17th to lift its per share price
above $1 for 10 consecutive trading days in order to remain a
listed stock.

Meanwhile, the company is in the process of a merger with
Empagio , itself a human capital management and outsource
payroll company based in Orlando, Florida. The merger offer
from Empagio was announced by Workstream at the end of
2007 and approved by the Workstream board early in the year.
The deal gives Empagio 75 percent of the merged company.

**Search Inside
Recruiting**

[            ] GO

**Contributors**
Todd Raphael
Elaine Rigoli

Although a Workstream press release from February says there
is a "definitive agreement" between the two companies, in at
least one conversation with creditors a Workstream official said
resolving past due bills was important to moving the merger
forward.

**Archives**
June 2008
May 2008
April 2008
March 2008
February 2008
January 2008
December 2007
November 2007

Calls and emails to executives at Empagio and Workstream were
not returned.

Jason Corsello, vice president, Center of Excellence at
Knowledge Infusion, said the current state of Workstream's

finances puts it in a precarious position. Complying with the NASDAQ requirements amid mounting financial losses "looks very challenging," he said, though it could be achieved by a reverse stock split.

The company, which at one point "had some good products" is losing market position every day, Corsello told us. "They haven't been so visible for a while now. So I would have to say they are in a tough position."

In the fall, Workstream released a set of integrated talent products under the name TalentCenter 7.0 that gained it complimentary review. Leighanne Levensaler, principal analyst with Bersin & Associates, was quoted in InfoWorld calling it a "truly integrated" HR platform and "not just a bunch of disparate applications."

TalentCenter 7.0 weds the offerings from the companies that Workstream acquired during a buying spree between 2002 and 2006. Among the companies it bought were Paula Allen Holdings, 6FigureJobs.com, RezLogic, ResumeXpress, Peopleview, Bravanta and HRSoft.

Whether the new offering can gain traction quickly enough is a big question, especially given the turmoil in its executive suite. In the past year, Workstream has seen almost a complete turnover of its executive team. For instance, Deepak Gupta, appointed CEO in February 2007, was gone less than a year later. Philip Oreste was appointed CFO in June 2007. He, too, is gone.

"Now that the entire management and sales team is essentially gone, they have lost all goodwill and have become practically invisible in the market," says Corsello.

— *John Zappe*

comments (0) | trackbacks (0) | email this item

**trackbacks**

Trackback URL for this post:
http://www.ere.net/tb/12ACE1564EE74D4D9C552EA17E

Listed below are links to blogs that reference Can Workstream Hang On?:

*There are currently no trackbacks for this news item.*

**comments**

*There are currently no comments for this news item.*

Please log in to post a comment to this blog. New users click here.

s

October 2007
September 2007
August 2007
July 2007
June 2007
May 2007
April 2007
March 2007
February 2007
January 2007
December 2006
November 2006
October 2006
September 2006
August 2006
July 2006
June 2006
May 2006

Syndication


www.crljournal.com

# EXHIBIT C



2600 Lake Lucien Drive
Suite 410
Maitland, FL 32751

(T) 407 475 5500
  8 i6 953 6800
(F) 407 475 5500

June 13, 2008

**VIA FACSIMILE AND FEDEX**

Empagio Acquisition LLC
225 East Robinson Street
Suite 240
Orlando, FL  32801
Attention:  Seth Bernstein, Chief Executive Officer

    Re:  Merger Agreement

Dear Seth:

    I am writing to inform you that Workstream Inc. and Workstream Merger Sub Inc. hereby terminate the Agreement and Plan of Merger dated as of February 12, 2008 among Workstream Inc., Workstream Merger Sub Inc., Empagio Acquisition LLC and SMB Capital Corporation pursuant to Sections 7.01(d) and (f) thereof.  In addition, pursuant to Section 7.02(b) of the Agreement and Plan of Merger, within five business days of the date hereof, Empagio Acquisition LLC and/or SMB Capital Corporation shall pay Workstream Inc. a termination fee of $5,000,000, by wire transfer of immediately available funds as follows:

    Bank of America
    Routing # 026-009-593
    Account # 005481700513
    Account Name: Workstream USA Inc. Operating Account

    Sincerely,

    Michael Gerrior
    Chairman, Special Committee of the Board of Directors

cc:    Steven D. Bartlestone, Esquire
    Michael J. Heller, Esquire
    Scott E. Brucker, Esquire

% JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Empagio Acquisition LLC and SMB Capital Corporation | Workstream Inc. |

| (b) County of Residence of First Listed Plaintiff _____ (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Ottawa, Ontario, Canada (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
|---|---|

(c) Attorney's (Firm Name, Address, and Telephone Number)
(d)
Michael J. Maimone, Esq.
Greenberg Traurig, LLP
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) ☐ 153 Recovery of Overpayment of Veteran's Benefits ☒ 160 Stockholders' Suits ☐ 190 Other Contract ☐ 195 Contract Product Liability ☐ 196 Franchise | PERSONAL INJURY ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury | PERSONAL INJURY ☐ 362 Personal Injury— Med. Malpractice ☐ 365 Personal Injury — Product Liability ☐ 368 Asbestos Personal Injury Product Liability PERSONAL PROPERTY ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | ☐ 610 Agriculture ☐ 620 Other Food & Drug ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 630 Liquor Laws ☐ 640 R.R. & Truck ☐ 650 Airline Regs. ☐ 660 Occupational Safety/Health ☐ 690 Other | ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 PROPERTY RIGHTS ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark SOCIAL SECURITY ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV ☐ 810 Selective Service ☐ 850 Securities/Commodities/ Exchange ☐ 875 Customer Challenge 12 USC 3410 ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts ☐ 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | LABOR | FEDERAL TAX SUITS | ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation ☐ 220 Foreclosure ☐ 230 Rent Lease & Ejectment ☐ 240 Torts to Land ☐ 245 Tort Product Liability ☐ 290 All Other Real Property | ☐ 441 Voting ☐ 442 Employment ☐ 443 Housing/ Accommodations ☐ 444 Welfare ☐ 445 Amer. w/Disabilities - Employment ☐ 446 Amer. w/Disabilities - Other ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence Habeas Corpus: ☐ 530 General ☐ 535 Death Penalty ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt.Reporting & Disclosure Act ☐ 740 Railway Labor Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act ☐ 900 Appeal of Fee Determination Under Equal Access to Justice ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332

Brief description of cause:
Declaratory judgment and breach of contract action rgarding merger agreement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE
6/25/08

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

American LegalNet, Inc. | www.USCourtForms.com